A07A0755. MOORER v. THE STATE.
(649 SE2d 537)

BARNES, Chief Judge.

After his jury conviction for armed robbery, burglary, kidnapping, and possession of a firearm during the commission of a felony, Winfred Moorer appeals the denial of his motion for new trial. He contends the trial court erred in (1) denying his motion to suppress; (2) failing to excuse a juror for cause; (3) denying his motion to exclude a witness under the rule of sequestration; (4) sentencing him as a recidivist; and (5) sentencing him to life imprisonment on the kidnapping charge. Upon review, we affirm.

1. Moorer claims the trial court erred in denying his motion to suppress because the search of his home was not justified as a protective sweep, or under the independent source or inevitable discovery rule. We disagree.

> On appeal from a ruling on a motion to suppress, we must construe the evidence most favorably to affirming the trial court's factual findings and judgment. We accept the trial court's factual and credibility determinations unless they are clearly erroneous, and the factual findings will be upheld if they are supported by any evidence. The trial court's application of the law to undisputed facts, however, is subject to a de novo standard of review.

(Citation omitted.) *State v. Dixon*, 267 Ga. App. 320 (599 SE2d 284) (2004).

So viewed, the evidence reveals that a man rang the doorbell of the 73-year-old victim's residence. The man, later identified as Moorer, was holding a red folder and told the victim he was looking for a certain address. As the victim started to respond, a second man who had been hiding in a nearby hedge pointed a gun at the victim's head and took his wallet. Moorer also pulled out a gun, demanded that the victim take them into his house, and asked where the jewelry and money were located. The victim took the men to his safe in his basement office, and after he opened the safe, Moorer tied the victim to a chair with an extension cord. Moorer emptied the contents of the safe into a pillowcase or containers the men had with them. Before leaving the basement, Moorer reenforced the extension cord binding the victim with ski rope. When the men left the basement, the victim freed himself and escaped through the basement door. He called 911 from a neighbor's house.

When police responded, they discovered the red folder Moorer had with him near the safe in the basement. The folder contained an employment application filled out by Moorer, and police were also

able to retrieve a thumb print from the envelope that matched Moorer's left thumb. That same day, police compiled a photographic lineup including Moorer, and the victim identified Moorer as one of the intruders. Police obtained an arrest warrant for Moorer which they served that same night.

When police arrived at Moorer's home, Moorer answered the door and the sheriff's deputy asked if he and the other officer could come in to talk with him about the warrant. The deputy testified that Moorer told them to come in and they went to a den-like area to talk. The deputy said that when Moorer appeared to get nervous, he placed handcuffs on him. The deputy also testified that several other deputies and police officers entered the home to check for other people who might be in the house. He testified that they told Moorer and his wife, who was also present, that they needed to look around for other people and the couple said "Fine. Go ahead. There's nobody here but us, you can go ahead and look." The deputy testified that the officers looked around for a couple of minutes and found no one else in the residence.

Another officer who was involved in serving the warrant testified that he was aware that there were two people who had committed the crime so we did a "cursory search inside the house of the rooms to make sure nobody was hiding." When he checked the guest bedroom in the basement, he checked the closet and looked under the bed. The officer testified that he saw a canvas bag or box with a handgun on top of it and became alarmed because Moorer's wife had told police that there were no weapons in the house. He left the items under the bed and reported what he found to the detective. The officer further testified that Moorer's wife was initially upset, but when they "assured her that we . . . needed to [search] for all of our safety . . . that seemed to make her at ease. And then we began the safety search."

The detective who was present testified that he read Moorer his *Miranda* rights while the other officers did the safety search. He asked Moorer if they could search the house and when Moorer responded that "I don't want to talk to you," he had another officer take Moorer out to the police car. Moorer's wife was extremely upset, and told him that they would have to get a search warrant before they could search the house. He testified that she was screaming and would go from "calm to screams in a few seconds." While he was with the wife, the detective was notified that Moorer wanted to see him, and he had an officer bring Moorer back into the residence. The detective explained that he wanted to get permission to search the residence, and Moorer told him, "Go ahead. No problem." The wife responded that it was her house and police could not search without a warrant, and the detective had Moorer taken out again.

The detective testified that each time they were about to secure the house and get the warrant, Moorer would ask to see him and would want to talk with his wife about the search. Moorer consented to the search each time, but his wife would say no. On the last occasion, the detective went to the police car where Moorer was being held, and Moorer told him that he wanted to tell the detective the truth. Moorer told the detective that "his friends brought the stuff over here," and "it's in the house." He asked if he could talk with his wife and calm her down and the detective let the couple talk in private, after which the wife said, "Ya'll can search." The detective asked the wife to sign a consent to search and she agreed.

Contrary to Moorer's contention otherwise, the search of his house was justified as a protective sweep and the trial court did not err in denying his motion to suppress. The officers knew that there were two men involved in the robbery and that both men had guns when they committed the crime. Having located Moorer at the residence, it was reasonable for police to ascertain if the other man involved with the robbery was in the residence as well.

> Police officers are authorized to make a protective sweep in conjunction with an in-home arrest when they possess "articulable facts which, taken together with the rational inferences from those facts, would warrant a reasonably prudent officer in believing that the area to be swept harbors an individual posing a danger to those on the arrest scene." *Maryland v. Buie*, 494 U. S. 325, 334 (110 SC 1093, 108 LE2d 276) (1990). It would thus appear that the officers in this case had the grounds needed to justify a protective sweep. And even if they did not, exigent circumstances did permit a cursory search of the house in order to prevent the escape of unknown individuals. See *United States v. Rubin*, 474 F2d 262, 268-269 (3), (4) (3rd Cir. 1973).

*Inglett v. State*, 239 Ga. App. 524, 525 (1) (521 SE2d 241) (1999). Moreover, Moorer and his wife consented to the protective sweep of the house.

Although Moorer also argues that his wife's consent was not voluntarily and freely given, the wife's consent or lack thereof is not essential in the disposition of this case.

It is generally true that when "persons have equal use and control of the premises to be searched . . . the consent to conduct a warrantless search of a residence given by one occupant is not valid in the face of the refusal of another occupant who is physically present at the scene to permit a warrantless search." *State v. Randolph*, 278 Ga. 614 (604 SE2d 835) (2004). It is also true, however, that

the Fourth Amendment right against unreasonable search and seizure is a personal right and may not be asserted vicariously. Thus, such right may be enforced only at the instance of the person whose protection was infringed by the search and seizure. The *Randolph* case . . . stands for the proposition that a physically present co-occupant's stated refusal to permit entry prevails, rendering the warrantless search unreasonable and invalid *as to him*. It does not vicariously impute [Moorer's wife's] refusal to consent . . . to [Moorer].

(Citations and punctuation omitted; emphasis in original.) *Valle v. State*, 282 Ga. App. 223, 225 (2) (638 SE2d 394) (2006). Here, the evidence shows that Moorer consented to the search of his house. Accordingly, the trial court did not err in denying Moorer's motion to suppress.

2. Moorer next contends that the trial court erred in its refusal to excuse a juror who indicated that she was unsure of whether she could be fair. We do not agree.

The record shows that Moorer requested that juror number 87 be excused for cause because "she initially stated that she didn't think she could be fair and then she was rehabilitated by the [State]." The State responded that there was only "some equivocation on her part." The trial court pointed out that "her exact words were, 'I'm not sure.' . . . That is not saying you can't be." The court overruled the objection and included the juror in the panel.

The decision whether to strike a juror for cause lies within the trial court's discretion and will only be disturbed upon an abuse of that discretion. *Rocha v. State*, 248 Ga. App. 53 (1) (545 SE2d 173) (2001). And in order to strike a juror for bias, there must be evidence that the juror is so inured in his position that he will be unable to set his bias aside. "Before a juror can be disqualified for cause, it must be shown that an opinion held by the potential juror is so fixed and definite that the juror will be unable to set the opinion aside and decide the case based upon the evidence or the court's charge upon the evidence." (Citation omitted.) Id.

The trial court was uniquely positioned to observe the demeanor of each juror and thereby evaluate her capacity to render an impartial verdict. Giving deference to the trial court's finding that the juror was credible in stating that she would serve as an unbiased juror, we cannot conclude that the trial court abused its discretion in denying Moorer's motion to strike for cause this juror. *Kirkland v. State*, 271 Ga. 217, 219 (2) (518 SE2d 687) (1999).

3. We find no violation of the rule of sequestration in permitting the lead investigator to remain in the courtroom during trial. The

officer was on the scene at the time of the arrest and search and the State asked that he "be allowed to remain in to assist me in the orderly presentation of the case." "This court previously has held that in similar circumstances, the exception of a witness from the rule of sequestration does not constitute an abuse of the trial court's discretion." *Sweat v. State*, 203 Ga. App. 290 (1) (416 SE2d 845) (1992). The exception has been applied to lead investigators, as was the case here, who are needed to assist the prosecution (or defense) at trial. See *Allen v. State*, 208 Ga. App. 854 (2) (432 SE2d 600) (1993) (the trial court granted the exception to the rule in response to a representation by the prosecutor that the officer's presence was needed to assist the prosecutor with the trial).

4. Moorer also contends the trial court erred in sentencing him as a recidivist. He argues that the State could not use an uncounseled guilty plea to support a recidivist punishment or in aggravation of sentencing.

> When introducing evidence of prior convictions based on guilty pleas, the . . . State must initially prove only the existence of the prior guilty plea and that defendant was represented by counsel in all felony cases and all misdemeanor cases resulting in imprisonment. The burden then shifts to the defendant to produce some affirmative evidence showing an infringement of his rights or a procedural irregularity when the plea was taken.

(Citations omitted.) *White v. State*, 245 Ga. App. 725, 727 (4) (538 SE2d 797) (2000). The State met that burden by presenting to the trial court a certified copy of a guilty plea for armed robbery that was signed and initialed by Moorer's defense counsel, and a copy of the transcript from the plea hearing. Moorer then had the burden of "produc[ing] some affirmative evidence showing an infringement of his rights or a procedural irregularity in the taking of the plea,"*Nash v. State*, 271 Ga. 281, 285 (519 SE2d 893) (1999), but presented no such evidence.

Moorer does not complain that his plea was uncounseled; instead he argues that the transcript of the plea hearing was uncertified and unauthenticated, and because it was the only proof that the State had of the plea on the prior conviction, his recidivist sentence should be vacated.

Pretermitting the admissibility of the plea hearing transcript, as noted above, the State also presented a certified copy of the plea showing representation which was admissible pursuant to OCGA § 24-7-20. Unless Moorer produced evidence of invalidity once the

fact of conviction was proved and the State showed that he was represented by counsel, the State has carried its burden under *Nash*.

5. Moorer next contends that the trial court erred in sentencing him to life imprisonment on the kidnapping conviction absent a showing that the victim was injured. This argument is meritless.

> OCGA § 17-10-7 (b) (2) provides that any person who is convicted of a "serious violent felony" and subsequently commits and is convicted of a second "serious violent felony" shall be sentenced to life imprisonment without parole. . . . Serious violent felonies are defined as murder, felony murder, armed robbery, kidnapping, rape, aggravated child molestation, aggravated sodomy, and aggravated sexual battery. OCGA §§ 17-10-6.1 (a); 17-10-7 (b) (1).

*Ortiz v. State*, 266 Ga. 752, 753 (2) (470 SE2d 874) (1996). There is no requirement that the kidnapping victim receive bodily injury when the sentencing is pursuant to OCGA § 17-10-6.1. See OCGA § 16-5-40 (c) ("Any person convicted under this Code section shall, in addition, be subject to the sentencing and punishment provisions of Code Sections 17-10-6.1 and 17-10-7."). Further, Moorer was also properly sentenced to life without parole for the armed robbery conviction. *Thompson v. State*, 265 Ga. App. 696, 698 (2) (595 SE2d 377) (2004). Accordingly, the court correctly imposed the mandatory life without parole sentence for either of Moorer's second serious violent felonies — kidnapping and armed robbery.

*Judgment affirmed. Smith, P. J., and Miller, J., concur.*

DECIDED JULY 6, 2007 —

*Sexton, Key & Hendrix, Joseph S. Key*, for appellant.
*Tommy K. Floyd, District Attorney, Alicia C. Gant, Assistant District Attorney*, for appellee.