**SECOND DIVISION**
**ANDREWS, P. J.,**
**MILLER and BRANCH, JJ.**

**NOTICE: Motions for reconsideration must be** *physically received* **in our clerk's office within ten days of the date of decision to be deemed timely filed.**
**http://www.gaappeals.us/rules**

**October 15, 2015**

# In the Court of Appeals of Georgia

A15A0831. CAUSEY v. THE STATE.

BRANCH, Judge.

Following a stipulated bench trial, Michael Van Causey was convicted on one count of possession of methamphetamine. On appeal, he contends the trial court erred by denying his motion to suppress. For the reasons that follow, we reverse and remand with direction.

On review of a ruling on a motion to suppress, the trial judge's findings of fact should not be disturbed if there is any evidence to support them; determinations of fact and credibility must be accepted unless clearly erroneous; and the evidence must be construed in favor of the trial court's findings and judgment. *Tate v. State*, 264 Ga. 53, 54 (1) (440 SE2d 646) (1994); *Jackson v. State*, 258 Ga. App. 806, 807-808 (2) (575 SE2d 713) (2002). "In all cases, [appellate courts] independently apply the law

to the facts." *Drake v. State*, 296 Ga. 286, 288 (2) (766 SE2d 447) (2014) (citation omitted).

The evidence presented at the hearing on the motion to suppress shows that Deputy William Schwartz and at least three other officers of the Floyd County Sheriff's office, who were seeking to execute an arrest warrant for one Jesse Powell, went to Causey's home based on a tip that Powell could be found there; Powell did not reside at that address and the officers did not have a warrant to search Causey's home. Officers Schwartz and Salter went to a position where they could observe the side door of the house; Corporal Whitfield and Deputy Burt approached the front door of the home and were able to observe Powell sitting on a couch. When the officers knocked and announced that it was the police, the officers at the front door saw Powell get up and run through the house. Schwartz then saw Powell run past the side door and saw "a couple other flashes go by"; he clarified that he recognized one of the "flashes" as a fellow officer, apparently Corporal Whitfield. Schwartz kicked in the side door, entered the premises with Deputy Salter, and, along with Whitfield and yet another officer (Watkins), chased Powell into a bathroom where a struggle ensued. Powell was eventually subdued and placed in hand restraints. Whitfield and Powell were injured in the struggle, an ambulance was called, and ultimately,

2

Whitfield was taken to the hospital to get stitches. Causey and a guest were handcuffed and sitting on a sofa during this time.

While waiting for the ambulance to arrive, Schwartz walked through the house to "clear[ ] the house," or "to make sure there's nobody else hiding in a closet or anything else, to make sure it's safe." He did so "as a safety precaution to ourselves while we're there," and "to make sure the scene is safe especially before bringing in other public safety personnel," meaning in this case, medical personnel. He testified that such a search was especially necessary in a "fast moving" situation. Schwartz further testified that given that Causey was a known drug user, that Causey's guest also had a pending warrant for a violent offense, and that Powell was fleeing law enforcement, "[i]t wouldn't be a far stretch of the imagination for someone to be there in a closet." Schwartz later added that the officers "had to be there"; read in context and construed in favor of the trial court's ruling, this statement refers to the officers remaining at the house until the ambulance arrived to care for Whitfield. Finally, Schwartz testified, "You've got everybody known to be drug users. You know, people that have tried to cause harm to police before. . . [and therefore] I would have reason to believe, in a place like that, there would be more people that may possibly be wanted for warrants."

3

While clearing the house, Schwartz looked into a bedroom and observed what he suspected was methamphetamine in plain sight on a dresser. Schwartz did not collect the suspected contraband; rather he went to the living room, found Causey handcuffed and sitting on a sofa, and read Causey his *Miranda* rights. Causey then consented to a search, signed a consent form, and answered questions in which he admitted that the drugs were found in his bedroom and that the drugs did not belong to the guest. Schwartz then collected the suspected contraband and searched the remainder of the house for other illegal substances, but none were found.

Although the trial court's order denying the motion to suppress does not include findings of fact, at the hearing the trial court reasoned as follows:

> You've got to look at this in all the totality of the circumstances. The officer saw Mr. Powell running from the living room towards the bathroom. He's fleeing towards the back of the house and shutting the door to close – to get into the bathroom. The officers have every reason to believe that if he was running to secure himself in the back of the house[, w]ho else might have secured themselves in the back of the house? It doesn't have anything to do with these fellow[s'] reputations or criminal records. It has to do with the circumstances at the time. A wanted fugitive was running and trying to hide from the police when they entered the house. . . . The fact that there was an injury, and a severe injury – it wasn't just a scratch. It required stitches to the officer. Required them to stay and be there and wait on EMTs and have Mr.

4

Powell treated as well as the deputy treated. He would be derelict in his duty if he did not check to see if anybody else had gone to hide in that house somewhere given the circumstances at the time.

Based on the above facts and on Causey's stipulation to venue and to the facts that the contraband was methamphetamine, that the methamphetamine was found in Causey's room, and that Causey denied it belonged to his guest, Causey was convicted of possession of methamphetamine.

1. We first comment on an issue not argued on appeal. "[A]bsent exigent circumstances, the Fourth Amendment prohibits police from searching an individual's home or business without a search warrant even to execute an arrest warrant for a third person." *Pembaur v. City of Cincinnati*, 475 U. S. 469, 474 (I) (106 SCt 1292, 89 LE2d 452) (1986), citing *Steagald v. United States*, 451 U. S. 204 (101 SCt 1642, 68 LE2d 38) (1981). Here, in the trial court, the State asserted that the officers at the front door had exigent circumstances to enter Causey's home, the trial court agreed that the officers had a right to enter the home, and Causey has not contested that issue on appeal. That question, therefore, is not before us.

2. "A 'protective sweep' is a quick and limited search of premises, incident to an arrest and conducted to protect the safety of police officers or others." *Maryland*

5

*v. Buie*, 494 U. S. 325, 327 (110 SCt 1093, 108 LE2d 276) (1990). Protective sweeps force courts to balance the Fourth Amendment's protection from unreasonable search and seizure against an officer's interest "in taking steps to assure [herself] that the house in which a suspect is being, or has just been, arrested is not harboring other persons who are dangerous and who could unexpectedly launch an attack." Id. at 333 (III). In striking a balance between these interests, the United States Supreme Court has held that incident to an arrest in a home, officers may "as a precautionary matter and without probable cause or reasonable suspicion, look in closets and other spaces *immediately adjoining the place of arrest* from which an attack could be immediately launched." Id. at 334 (III) (emphasis supplied).[1] But to search beyond the immediately adjoining spaces,

> there must be articulable facts which, taken together with the rational
> inferences from those facts, would warrant a reasonably prudent officer
> in believing that the area to be swept harbors an individual posing a
> danger to those on the arrest scene.

[1] Here, the State does not contend that the bedroom immediately adjoined the place where Powell was arrested.

6

Id. A "mere inchoate and unparticularized suspicion or hunch" that the home may harbor an individual posing a danger to the officers is insufficient to support a warrantless sweep. Id. at 332 (III) (citation and punctuation omitted).[2]

At first blush, this appears to be a close case and that some evidence supports the trial court's findings, which is all that is required by the standard of review. But, as shown below, the State presented no evidence to support the conclusion that a reasonable officer could have reasonably believed that *additional* dangerous individuals were in the home. The trial court found that because the officers were pursuing a felon fleeing toward the back of the house, they could reasonably believe that there might be another person in the back of the house thereby warranting a protective sweep while they waited for medical personnel to arrive. The "fast moving" nature of the situation is also relevant. And "[a]lthough we review police actions from the standpoint of a hypothetical 'reasonable' officer, we must measure those actions from the foresight of an officer acting in a quickly developing situation and not from the hindsight of which judges have benefit." *State v. Brannan*, 222 Ga. App. 372, 373 (1) (474 SE2d 267) (1996) (citation and punctuation omitted).

---

[2] A proper protective sweep "may extend only to a cursory inspection of those spaces where a person may be found." Id. at 335 (III) (footnote omitted).

Nevertheless, Schwartz never testified to any facts to support a belief that there were more than three people in the house before the officers arrived. Nor did he testify to any facts that developed after the officers arrived that support an inference that there were more than three people, other than officers, in the house when the officers actually entered the house. Although he testified that he saw two "flashes" after Powell ran by (one of whom he recognized as a fellow officer), Schwartz never testified that he thought the other flash was someone other than an officer, and the facts show that at least one more officer who entered through the front door ended up in the bathroom subduing Powell. Also, even though Schwartz testified that the occupants' outstanding warrants and reputations gave him concern about who else could be in the house, the trial court specifically found that fact to be irrelevant.

In *Buie*, the Supreme Court rejected a "bright-line rule" that police should be permitted to conduct a protective sweep whenever they make an in-home arrest for a violent crime. *Buie*, 494 U. S. at 334 (III), n. 2. Instead, following the reasoning of *Terry v. Ohio*, 392 U. S. 1 (88 SCt 1868, 20 LEd2d 889) (1968), the Supreme Court held even though some danger might exist, a protective sweep requires a "reasonable, individualized suspicion" of that danger:

8

[D]espite the danger that inheres in on-the-street encounters and the need for police to act quickly for their own safety, the Court in *Terry* did not adopt a bright-line rule authorizing frisks for weapons in all confrontational encounters. Even in high crime areas, where the possibility that any given individual is armed is significant, Terry requires reasonable, individualized suspicion before a frisk for weapons can be conducted. That approach is applied to the protective sweep of a house.

*Buie*, 494 U. S. at 334 (III), n. 2.

Georgia and Eleventh Circuit Cases applying *Buie* are consistent in requiring that some facts be presented that show or raise a reasonable inference that other persons who might present a danger are present in the home, not simply uncertainty as to whether such persons are present. For example, in *United States v. Hollis*, 780 F3d 1064, 1069 (III) (A) (11th Cir. 2015), the government presented evidence that the officers had been told that the apartment was a "'drug house,' with a 'high level of activity,' where 'people were in and out of the house all hours of the day or night,' and that they 'could expect to encounter a number of people inside.'" Id. (punctuation omitted). Accordingly, the officers were authorized to make a rational inference that there might be armed individuals present. Id. In *United States v. Chaves*, 169 F3d 687 (11th Cir. 1999), the Eleventh Circuit held that where officers had no information

9

regarding the inside of a warehouse, they had no specific and articulable facts to show the presence of another individual in the warehouse who posed a danger to the officers even though two armed men suspected of being involved in drug activity exited the warehouse in the officers' presence. Id. at 689, 692. See also *United States v. Sunkett*, 95 FSupp2d 1367, 1372 (II) (A) (N.D. Ga. 2000) (fact that someone else "might be" present is not enough to support a protective sweep).

In both *Lawson v. State*, 299 Ga. App. 865, 870 (2) (684 SE2d 1) (2009) and *Moorer v. State*, 286 Ga. App. 395, 397 (1) (649 SE2d 537) (2007), one fact that the court used to justify upholding a protective sweep was that although officers were initially aware of only one armed robber in the house that was searched, two armed men had been involved in the crime and had fled together, thereby rasing a reasonable inference that the second armed robber could be in the house. And in *Inglett v. State*, 239 Ga. App. 524, 525 (1) (521 SE2d 241) (1999), a protective sweep was upheld where the resident who received a package containing a large quantity of drugs referred to those in the house in the plural, officers observed at least one other individual in the residence, and an officer testified that guns were bound to be present with such a large amount of narcotics. Compare *Nelson v. State*, 271 Ga. App. 658, 661 (1) (c) (610 SE2d 627) (2005) (where police testified that "with drugs safety is

10

our number one concern. We don't want anybody to get shot," and that they were confronted with fleeing suspects in a quickly developing situation, a cursory sweep was sustainable; this finding is dicta, however, because the Court also held that the motion to dismiss was properly denied because the relevant evidence was not discovered during the sweep, i.e., it was not the fruit of the poisonous tree) (punctuation omitted).

Here, Schwartz did not testify to any information to support the presence of additional dangerous individuals in the home. He could only imagine that such people might be present based on the facts that Powell was fleeing, that one or two of the occupants had outstanding warrants, and that the occupants of the residence were drug users. None of these facts support an rational inference that anyone other than the three men near the front door were present, let alone dangerous. We therefore conclude that the State failed to present articulable facts and rational inferences from those facts to warrant a reasonably prudent officer in believing that the remainder of Causey's home harbored any individuals who posed a danger to the officers or others. See *Buie*, 494 U. S. at 334 (III).

3. Nevertheless, suppression of the evidence of methamphetamine is not necessarily required:

11

> Even assuming the illegality of the initial entry and search, a party's subsequent consent to the search, which is freely and voluntarily given, may serve as an independent act of free will that purges the primary taint and authorizes admission of the evidence. Several factors for courts to consider in addressing this issue include the time elapsed between the illegality and the acquisition of the evidence; the presence of intervening circumstances; and the purpose and flagrancy of the official misconduct.

*Park v. State*, 308 Ga. App. 648, 651 (1) (708 SE2d 614) (2011) (citations, footnote and punctuation omitted). See also *State v. Driggers*, 306 Ga. App. 849, 852 (3) (702 SE2d 925) (2010) ("The fruits of an illegal search or arrest should be suppressed when they bear a significantly close relationship to the underlying illegality.") (citation and punctuation omitted). Although we would consider this issue if the trial court had ruled on it, the trial court appears to have relied solely on the validity of the protective sweep. We therefore remand the case to the trial court to address the question whether Causey's consent to search was voluntary and sufficiently attenuated from the illegal protective sweep to justify the introduction of the seized methamphetamine in Causey's trial. See *State v. Sapp*, 214 Ga. App. 428, 432 (3) (448 SE2d 3) (1994) (whether urinalysis testing was sufficiently attenuated from illegal investigative stop depended on facts not addressed by the trial court, and therefore a remand was necessary).

We therefore vacate the judgment and remand with direction for the court to reconsider Causey's motion to suppress and for other proceedings consistent with this opinion.

*Judgment reversed and case remanded with direction. Andrews, P. J., and Miller, J., concur.*