**NOTICE: This opinion is subject to modification resulting from motions for reconsideration under Supreme Court Rule 27, the Court's reconsideration, and editorial revisions by the Reporter of Decisions. The version of the opinion published in the Advance Sheets for the Georgia Reports, designated as the "Final Copy," will replace any prior version on the Court's website and docket. A bound volume of the Georgia Reports will contain the final and official text of the opinion.**

# In the Supreme Court of Georgia

Decided: February 18, 2025

S24A1340. RENDER v. THE STATE.

COLVIN, Justice.

Appellant Ladarius Travon Render appeals his conviction for felony murder in connection with the death of Kenneth Moore, as well as his convictions for aggravated assault against other victims, theft by taking, and theft by receiving stolen property.[1] On appeal,

---

[1] The crimes occurred over a period of several days in December 2017. On July 10, 2018, a Muscogee County grand jury returned a 15-count indictment against Appellant, Devin Burden, Marquez Clayton, and Kevonta Daniels. Appellant was charged with committing theft by taking on December 17, 2017, in connection with the theft of a Toyota Tacoma (Count 6). Appellant was also charged with committing several crimes on December 18, 2017, in connection with the death of Kenneth Moore, including malice murder (Count 1), felony murder predicated on burglary (Count 2), burglary in the first degree (Count 3), armed robbery (Count 4), and aggravate assault (Count 5). Finally, Appellant was charged with committing several crimes on December 25, 2017, including the aggravated assault of Jai Williams, Jamal Williams, and James Williams (Counts 8, 9, and 10, respectively), the theft by taking of a Buick Lucerne (Count 12), and theft by receiving stolen property, namely, a stolen Acura MDX (Count 15).

Burden's case was severed from those of the other co-defendants, and he testified as a witness for the State. The remaining co-defendants (Appellant,

Appellant contends that the trial court erred in denying his motion for a directed verdict as to the non-murder counts, plainly erred in admitting testimony about videos that were not admitted at trial, and plainly erred in permitting a co-defendant to testify about statements another co-defendant made that incriminated Appellant. Appellant also argues that trial counsel was ineffective for failing to move to sever the counts. As explained below, we affirm Appellant's

---

Clayton, and Daniels) were jointly tried before a jury from June 17 through 27, 2019. At the close of the State's case in chief, Appellant moved for a directed verdict, which the trial court granted only as to Count 4. The jury found Appellant not guilty of Counts 1 and 6 but guilty of Counts 2, 3, 5, 8, 9, 10, 12, and 15. The jury acquitted Clayton of all charges against him (Counts 1, 2, 3, 5), and the jury found Daniels not guilty of malice murder (Count 1) but guilty of the other charges against him (Counts 2, 3, 5, 6, 8 through 10, and 12 through 14).

The trial court sentenced Appellant to life in prison with the possibility of parole for felony murder (Count 2). The court also imposed a 20-year consecutive sentence for each of the aggravated assaults charged in Counts 8, 9, and 10 and imposed concurrent 10-year sentences for theft by taking (Count 12) and theft by receiving stolen property (Count 15). The court merged the burglary count (Count 3), as well as the aggravated assault charged in Count 5, with Count 2 for sentencing purposes.

Appellant timely filed a motion for new trial through new counsel on August 29, 2019, and amended the motion on February 18, 2022. The trial court denied Appellant's motion for new trial, as amended, on June 16, 2022, and entered an amended order denying Appellant's motion for new trial on June 22, 2022. Appellant filed a timely notice of appeal from the amended motion-for-new-trial order. The case was docketed to this Court's August 2024 term and submitted for a decision on the briefs.

2

felony-murder conviction but reverse his other convictions because, as to those counts, the evidence was not sufficient under Georgia's accomplice-corroboration statute.

1. The trial evidence showed the following. On the night of December 17, 2017, a red Toyota Tacoma was stolen from a residence in Columbus, Georgia. The next morning, in response to a call about a burglary in progress, officers were dispatched to a house on Curry Street in Columbus, Georgia. Moore lived in the Curry Street house, and, when officers arrived on the scene, they found that Moore had been shot and was lying in the rear doorway between the kitchen and the back porch. The rear doorknob and door were damaged; the contents of the nightstands in the bedrooms had been removed and left on the floor; and Christmas presents, Moore's cell phone, and the spare keys to the family cars were missing from the house.

Moore, who was conscious when officers arrived, was taken to the hospital, where he received surgery and other treatment before dying two weeks later. The medical examiner testified that Moore

3

had two gunshot entrance wounds, one in the back side of the right shoulder and one on the left buttock. And the medical examiner concluded that the gunshots were a "major factor" in Moore developing blood clots in his legs that dislodged, traveled to his lungs, and caused his death.

Moore's across-the-street neighbor, Kaneesha Harris, testified that, on the day of the shooting, her motion-activated Ring-doorbell camera captured footage showing that a truck had circled by Moore's house a few times before pulling into Moore's driveway, and that "three guys" then got out of the truck. Detective Barry Davis and Officer Jerry Yarbrough, who responded to Moore's house following the shooting, testified that they had also seen the Ring-doorbell footage on a cell phone, and that it showed "three suspects" exiting a "red truck" or exiting Moore's house and getting into the "red truck." Officer Yarbrough added that the "general appearance" of the truck was consistent with a Toyota Tacoma.

Co-indictee Devin Burden, who was paralyzed from the waist down but was able to drive vehicles using "a stick," testified that he

4

drove the stolen Toyota Tacoma the next day, and that Appellant had been with him in the truck. Burden said he received the Tacoma from Appellant's 14-year-old co-defendant, Kevonta Daniels, while Appellant was present, and that Burden understood that the Tacoma must have been used in the Curry Street shooting because "that's the only car that [Daniels] was in possession of at the time." According to Burden, Daniels told him in Appellant's presence that "a burglary was committed on Curry Street," that "the homeowner was shot as he came back home and realized his house was being burglarized," that the homeowner was shot twice, and that Daniels "shot him" and Appellant also "fired a shot." Burden testified that Appellant did not respond when these statements were made.

Cecil Bergen, a friend of the defendants who was released from jail on January 4, 2018, and spent time with Appellant and Daniels later that day, testified that he had heard about "the incident" on Curry Street. Although Bergen initially testified that he heard about the incident while he was in jail, he admitted that he had previously told officers that he learned of the incident from Appellant and

5

Daniels. When asked if he had previously told officers, in reference to the Curry Street incident, that Appellant and Daniels told him that "we did some . . . awful [stuff] or some terrible stuff" and that Appellant also told him that "we caught a body," Bergen confirmed that he had made those statements. And when asked, Bergen confirmed that Appellant and Daniels had in fact made those statements to him.[2]

About a week after the Curry Street shooting, on December 24, 2017, a white Acura MDX was stolen when the owner left it running in the driveway outside his house in Columbus, Georgia. Burden testified that the theft of the Acura "just happened one night," and that the vehicle was used in the theft of another vehicle, which the record shows was a Buick Lucerne owned by Jamal Williams ("Jamal").

Jamal and his father, James Williams ("James"), testified that,

---

[2] On cross-examination, Bergen changed his story, saying that neither Appellant nor Daniels ever said anything to him about Curry Street. But on redirect, when asked again if, on January 4, 2018, Appellant had told him that "we did something terrible or awful" and "caught a body" "on Curry Street," Bergen responded, "Yes, sir."

Jamal's Buick was stolen from the driveway of James's residence in Columbus, Georgia, on Christmas Day 2017. Jamal testified that he drove the Buick to pick up his son at his father's house, and that, when he arrived, he parked the Buick in the driveway, left the keys in the car, and went inside.

According to Burden, he and Appellant were passengers in the stolen Acura when Daniels, who was driving the Acura, spotted the Buick. Burden said that he and Daniels saw that the Buick "was running[,] so [Burden] knew what was going to take place at the time." And according to Burden, he told Daniels "[n]ot to do it," but Daniels disregarded the comment. Burden testified that Daniels hopped out of the Acura and into the Buick, at which point Appellant took the driver's seat of the Acura.

James testified that, as Jamal and Jamal's son were leaving together out the back door, James saw a man come up the driveway, get in the Buick, and then back the Buick out of the driveway. Images captured by James's home security camera showed a man getting into the Buick, while a white SUV was present nearby on the

street. Jamal testified that, when he got outside, he saw someone driving away in his Buick toward the local park. And James testified that he, Jamal, and his other son, Jai Williams ("Jai"), got into James's car and followed the Buick.

James and Jamal saw the Buick parked at the local park. According to Jamal, as they pulled up to the Buick, he saw the driver get out of the car. And James said he saw the driver, whom he identified at trial as Daniels, raise a gun toward them. Responding to the raised gun, James turned the car sharply. Then, James and Jamal heard gunshots ring out; the car's glass shattered; and Jamal was struck by a bullet in his lower back. James testified that he and Jai, who were armed, got out of the car and returned fire.

Burden testified that Appellant drove him to the park to meet Daniels, and that, when they arrived, they saw that "a shooting [was] going [to] tak[e] place" between Daniels and two males who had exited another vehicle. Although Burden admitted previously telling officers that he had "fired shots at the other guys . . . in the other car pointing the guns at the Buick," he claimed at trial that he

8

and Appellant drove away from the park before any shots were fired "[t]o go get weapons," and that everyone was gone when they returned. When asked if he was "going to leave [his] friend there to be shot in the park" and if he "just left [Daniels] there to fend for himself," Burden responded, "naw, it wasn't like that," "[t]he plan was to come back," and he had left Daniels there to fend for himself "[j]ust for a minute."

Following the gunfight, Jai recovered the Buick, and James drove Jamal to the hospital. Officers responding to the park shooting found 9mm and .45-caliber shell casings on the scene, and an investigation revealed that James and Jai had used .45-caliber guns in the shootout.

Sometime after the park shootout, officers recovered the stolen Acura and found inside the center console a Charter Arms .38-caliber revolver with shell casings in the chamber. After testing and analysis, a ballistics expert determined that the Charter Arms revolver had fired a .38-caliber metal jacket recovered from Moore's body, and that a .32-caliber lead bullet, which was also recovered

9

from Moore's body, could not have been fired from the same gun.

2. Appellant contends that the trial court erred in denying his motion for a directed verdict on Counts 8 through 10 (aggravated assaults of Jai Williams, Jamal Williams, and James Williams), Count 12 (theft by taking of Jamal Williams's Buick), and Count 15 (theft by receiving stolen property, namely, the stolen Acura). According to Appellant, he was entitled to a directed verdict because the trial evidence was insufficient to support convictions on these counts under Georgia's accomplice-corroboration statute, which provides in relevant part that, in "felony cases where the only witness is an accomplice, the testimony of a single witness shall not be sufficient." OCGA § 24-14-8. We agree with Appellant that his convictions on these counts must be reversed due to inadequate accomplice corroboration.[3]

---

[3] We do not address the sufficiency of the evidence supporting Appellant's conviction for felony murder because he has not challenged that conviction on sufficiency grounds. See *Charles v. State*, 315 Ga. 651, 654 (2) n.2 (884 SE2d 363) (2023) ("As explained in *Davenport v. State*, 309 Ga. 385 (846 SE2d 83) (2020), we ended our practice of sua sponte review of the constitutional sufficiency of the evidence supporting convictions in appeals of

"The standard of review for the denial of a motion for a directed verdict of acquittal is the same as for determining the sufficiency of the evidence to support a conviction." *Clements v. State*, 317 Ga. 772, 783 (1) (896 SE2d 549) (2023) (citation and punctuation omitted). In assessing the sufficiency of the evidence,

> we view all of the evidence presented at trial in the light most favorable to the verdicts and ask whether any rational trier of fact could have found the defendant guilty beyond a reasonable doubt of the crimes of which he was convicted.

Id. at 789 (4) (citation and punctuation omitted).

"[U]nder Georgia law, testimony by an accomplice to a crime must be corroborated by other evidence implicating the defendant." *McGarity v. State*, 308 Ga. 417, 420 (841 SE2d 718) (2020) (citing OCGA § 24-14-8). It is well established that evidence corroborating an accomplice's testimony "may be circumstantial," "may be slight," and "need not of itself be sufficient to warrant a conviction of the

___

non-death penalty murder cases, starting with cases docketed to the December 2020 term of this Court." (citation and punctuation omitted)). See also *Golden v. State*, 310 Ga. 538, 540 (1) n.3 (852 SE2d 524) (2020) (declining to sua sponte review whether the evidence was sufficient under Georgia's accomplice-corroboration statute).

11

crime charged." *Sauder v. State*, 318 Ga. 791, 804-805 (5) (c) (901 SE2d 124) (2024) (citation and punctuation omitted). But corroborating evidence "must . . . be independent of the accomplice's testimony," "must . . . either directly connect the defendant with the crime or justify an inference that he is guilty," and "must corroborate both the identity of the defendant and the fact of his participation in the crime." Id. at 805 (5) (c) (citation and punctuation omitted). "In other words, . . . there must be some independent evidence tending to show that the defendant himself was a participant in the crimes." Id. (citation and punctuation omitted). "[C]orroboration of only the chronology and details of the crimes is not sufficient[.]" Id. (citation and punctuation omitted).

Here, the trial evidence was not sufficient under OCGA § 24-14-8 to support Appellant's convictions for theft by receiving the stolen Acura (Count 15), theft by taking of Jamal Williams's Buick (Count 12), and aggravated assault of Jai Williams, Jamal Williams, and James Williams (Counts 8, 9, and 10) because the only evidence showing that Appellant was present for, and participated in, those

12

crimes came from Burden, who was an accomplice to the crimes. See *Doyle v. State*, 307 Ga. 609, 612 (2) (a) (837 SE2d 833) (2020) ("A person may be charged as an accomplice if he directly commits the crime, intentionally causes some other person to commit the crime, intentionally aids or abets in the commission of the crime, or intentionally advises, encourages, hires, counsels, or procures another to commit the crime." (citation and punctuation omitted)). Specifically, as recounted above, Burden testified that, when Daniels exited the stolen Acura to steal the Buick, Appellant got into the driver's seat of the Acura and then drove Burden to the park to meet Daniels. Burden further testified that, when he and Appellant arrived at the park, he saw men from another vehicle pointing guns at Daniels. And at that point, according to Burden, Burden either fired shots at the men pointing guns at Daniels or Appellant drove Burden to retrieve weapons for Daniels's defense.

The State makes several arguments as to why Burden's testimony was adequately corroborated, but none of the evidence that the State points to supported a reasonable inference that

13

Appellant was present for, and participated in, those crimes. First, the State argues that testimony from the Williams family that a white vehicle was present when the Buick was stolen, corroborated Burden's story about how the co-defendants were in a white Acura when they happened upon the Buick. But while such testimony provided support for one part of Burden's story — that the person who stole the Buick arrived in a white Acura — it did not support a reasonable inference about who might have been inside the Acura and therefore did not "tend[ ] to show that [Appellant] himself was a participant in the crimes." *Sauder*, 318 Ga. at 805 (5) (c) (citation and punctuation omitted).

Second, the State points to evidence that, after the park shooting, officers recovered the Acura and found a gun in its center console. According to the State, the presence of the gun corroborated Burden's testimony that he and Appellant left the park to obtain weapons. But absent a connection between Appellant and the gun later found in the Acura, the mere presence of the gun at most corroborated Burden's testimony that *Burden* left the park to obtain

14

weapons. It did not support a reasonable inference that Appellant was with Burden at the time. Cf. *Taylor v. State*, 297 Ga. 132, 135 (2) & n.5 (772 SE2d 630) (2015) (holding that phone records showing that a cell phone placed calls to the victim's cell phone could not corroborate accomplice testimony about the defendant's participation in crimes where there was no independent evidence showing either that the phone placing the calls belonged to the defendant or that the defendant "actually made these phone calls"). And, importantly, the trial evidence did not show that Appellant ever possessed the gun found in the Acura. The evidence showed that the gun found in the Acura was one of two guns used in the Curry Street shooting and that Appellant was one of two or three people involved in the Curry Street shooting. But there was no trial evidence from which the jury could infer that Appellant, as opposed to Daniels or the unidentified third person, possessed the gun that was later found in the Acura during the Curry Street shooting. Nor was there any evidence that Appellant possessed that gun before or after the Curry Street shooting. As a result, the only reasonable

15

inference from the gun's presence in the Acura was that *someone* involved in the Curry Street shooting (Appellant, Daniels, or the third unidentified person) had been in the Acura.[4] It did not tend to show that *Appellant* was in the Acura, and thus did not show "the fact of his participation in the crime." *Sauder*, 318 Ga. at 805 (5) (c) (citation and punctuation omitted).

Third, the State points to testimony from Bergen that Appellant admitted being with Daniels during the Curry Street shooting, and that Bergen had seen Appellant and Daniels on "six days" between January 4 and 11, 2018. While Bergen's testimony about Curry Street directly connected Appellant to the crimes committed there on December 18, 2017, those crimes are not at issue in this enumeration of error. Rather, in this enumeration of error, Appellant argues that the evidence was insufficient to support his convictions for crimes allegedly committed on December 25, 2017. And Bergen's testimony that Appellant and Daniels were together

---

[4] Notably, Burden testified that Daniels, who had participated in the Curry Street shooting, was in the Acura when they happened upon the Buick.

about a week before those crimes, and that, more than a week after those crimes, Appellant and Daniels spent time together again did not support a reasonable inference that Appellant was present for, or participated in, crimes committed on December 25, 2017. See *Taylor*, 297 Ga. at 135 (2) (reversing convictions for inadequate accomplice corroboration because a third party's testimony that she saw the defendant together with the co-defendants "on the evening after the murder" did "nothing to indicate that [the defendant] actually *participated* in the crimes" (emphasis in original)). Cf. *Atkins v. State*, 304 Ga. 240, 245 (2) (818 SE2d 567) (2018) (reversing a statutory-rape conviction under a statute requiring corroboration of a victim's testimony because the "only possible evidence" corroborating the victim's testimony, which showed "the mere fact" that, "on occasion, [the victim] spent time at [the defendant's] house," did not "tend[ ] to prove the guilt of the accused by connecting him with the crime" (citation, punctuation and emphasis omitted)).

Finally, the State suggests that Burden's waist-down paralysis

supported an inference that Appellant was present for the crimes because Burden would have been unable, without assistance, to move to the Acura's driver's seat and drive away after Daniels exited the vehicle to steal the Buick. But there was no trial evidence indicating that Burden, who testified that he was able to drive despite his paralysis, would have required assistance to get from the passenger seat into the driver's seat. Nor was there any independent evidence corroborating Burden's testimony that he was in the Acura's passenger seat, rather than in its driver's seat, when Daniels exited the vehicle to steal the Buick. Accordingly, Burden's paralysis did not itself support a reasonable inference that Appellant must have been present when the Buick was stolen or during the subsequent shootout.

In sum, Appellant's convictions for committing aggravated assaults on the Williams family members (Counts 8, 9, and 10), theft by taking (Count 12), and theft by receiving stolen property (Count 15) were based solely on uncorroborated accomplice testimony from Burden, and the trial court erred in denying Appellant's motion for

18

a directed verdict on those counts. Accordingly, we reverse those convictions. See *Taylor*, 297 Ga. at 135 (2) (reversing a conviction for inadequate accomplice corroboration under OCGA § 24-14-8's statutory precursor); *Cowart v. State*, 294 Ga. 333, 343 (6) (751 SE2d 399) (2013) (explaining that, "if the evidence of [the defendant's] guilt was legally insufficient" under Georgia's accomplice-corroboration statute, "he could not be retried"). See also *Jefferson v. State*, 310 Ga. 725, 726-727 (854 SE2d 528) (2021) ("Once a reviewing court reverses a conviction solely for insufficiency of the evidence to sustain the jury's verdict of guilty, double jeopardy bars retrial." (citation and punctuation omitted)).

3. Having reversed Appellant's convictions for the non-murder charges, we now turn to his arguments challenging his felony-murder conviction. Appellant first argues that the trial court plainly erred in permitting Harris, Officer Yarbrough, and Detective Davis to testify about the contents of video footage captured by Harris's Ring doorbell, which, according to the witnesses, depicted three people and their red truck at Moore's home on Curry Street.

According to Appellant, the trial court erred because the evidence was clearly inadmissible under the best evidence rule, which provides that, "[t]o prove the contents of a writing, recording, or photograph, the original writing, recording, or photograph shall be required." OCGA § 24-10-1002. We conclude, however, that Appellant has not shown plain error.

At trial, Harris, Detective Davis, and Officer Yarbrough were each questioned about the Ring-doorbell footage. Harris testified that she showed the footage to detectives after the shooting, but that she no longer had the footage from her phone because she had "changed phones since then numerous . . . times." She further testified that she believed ADT, her home security provider, had the full footage, and she said that she had given ADT permission to give officers any footage they had. Detective Davis testified that he had seen the Ring-doorbell footage on a cell phone around the time of the shooting. And he said that the homeowner "was confused about who was responsible for the video, her or the alarm company"; that officers contacted both the homeowner's alarm company and Ring;

20

that the alarm company said Ring was responsible for the video; that Ring said the homeowner was responsible for the video; and that officers "were never able to get a copy of it." Finally, Officer Yarbrough testified that Harris had shown him the Ring-doorbell video on her phone after the shooting. When asked if he was able to get a copy of the video, Officer Yarbrough said that he "believe[d] [Harris] e-mailed [him] a copy from her phone," but that, because "[it had] been two years" since the shooting, he did not recall ever opening an emailed copy of the video and could not speak to the current whereabouts of any such copy.

We review a preserved claim that evidence was inadmissible under the best evidence rule for an abuse of discretion. See *Gude v. State*, 306 Ga. 423, 426 (2) (831 SE2d 807) (2019). But where, as here, an appellant did not object to the admission of evidence at trial, we review a claim that the trial court erred in admitting the evidence only for plain error. See *Huff v. State*, 315 Ga. 558, 564-565 (2) (883 SE2d 773) (2023). To establish plain error, an appellant must point to an error that was not affirmatively waived,

21

the error must have been clear and not open to reasonable dispute, the error must have affected his substantial rights, and the error must have seriously affected the fairness, integrity or public reputation of judicial proceedings.

Id. at 565 (2) (citation and punctuation omitted). A trial court's admission of evidence is not a "clear or obvious error" unless admitting the evidence was "a blatant abuse of discretion." *Strother v. State*, 305 Ga. 838, 848 (4) (d) (828 SE2d 327) (2019) (punctuation omitted). Thus, where the record would have "authorized" the trial court to admit the evidence if the appellant had raised an objection at trial, admitting the evidence is not a "clear and obvious error beyond reasonable dispute." *Westbrook v. State*, 308 Ga. 92, 101 (5) (a) (839 SE2d 620) (2020) (citations and punctuation omitted). See also *Carter v. State*, 317 Ga. 689, 694-695 (2) (895 SE2d 295) (2023) (holding that admitting evidence was not a "clear and obvious [error] beyond reasonable dispute" where there was a "reasonable argument" based on the record that the evidence was admissible (punctuation omitted)).

OCGA § 24-10-1002 (the best evidence rule) provides that

proving the contents of a recording generally requires a party to admit the original recording. Under OCGA § 24-10-1004 (1), however, other evidence of the contents of the recording is admissible if "[a]ll originals are lost or have been destroyed, unless the proponent lost or destroyed them in bad faith."

Here, the trial court did not commit any error, much less a clear and obvious error, under OCGA § 24-10-1002 in admitting testimony about the contents of the Ring-doorbell footage because the record authorized the trial court to admit the testimony under OCGA § 24-10-1004 (1). First, the record supported a determination that the Ring-doorbell footage was lost. Harris's testimony that the original Ring-doorbell video was stored on her cell phone and that she no longer had the video because she had changed cell phones established that her copy of the video was lost. And although there was a tension in the testimony of Detective Davis and Officer Yarbrough as to whether officers ever obtained a copy of the video, it would not have been "a blatant abuse of discretion," *Strother*, 305 Ga. at 848 (4) (d), for the trial court to find that officers never

obtained a copy, given that Officer Yarbrough could not recall ever opening a copy of the video, and given that Detective Davis testified that officers were never able to obtain a copy despite making efforts to do so. Second, Appellant has not pointed to any evidence indicating that bad faith on the part of the State played any role in making the Ring-doorbell footage unavailable for admission at trial. Because, on this record, the trial court would have been "authorized" to admit the challenged testimony under OCGA § 24-10-1004 (1) if Appellant had raised an objection under OCGA § 24-10-1002 at trial, Appellant has not established that the trial court committed any error, much less a "clear and obvious error beyond reasonable dispute." *Westbrook*, 308 Ga. at 101 (5) (a) (citations and punctuation omitted). Accordingly, this claim of plain error fails.

4. Appellant argues that the trial court plainly erred under OCGA § 24-10-1002 (the best evidence rule) in allowing Burden and Investigator Ray Harralson to testify at trial about the contents of a

Facebook Live video that was not admitted into evidence.[5] Specifically, he challenges the admission of Burden's and Investigator Harralson's testimony that, during Burden's custodial interview, Investigator Harralson showed Burden a Facebook Live video showing Burden and Appellant inside a red Toyota Tacoma that Burden was driving.

Assuming without deciding that the trial court's admission of such testimony was a clear and obvious error of law, Appellant has not established the third prong of plain-error review, which requires a showing of prejudice. See *Huff*, 315 Ga. at 565 (2). In order to establish prejudice for purposes of plain-error review, a defendant must show that an error likely affected the outcome of the trial-court proceeding. See id. And here, Appellant has not made that showing. The challenged testimony was relevant only to the extent that it tended to show that Appellant had been with Burden inside the red

[5] The State failed to produce the Facebook Live video during discovery. Several days into trial, however, the State obtained a copy of the Facebook Live video from Burden's public Facebook page and gave the defense a copy. Appellant opposed admission of the video, and the court excluded it.

Toyota Tacoma on the day after the Curry Street shooting, and that evidence was cumulative of other properly admitted evidence, namely, Burden's separate testimony from personal experience that, on the day after the Curry Street shooting, Daniels had given the Toyota Tacoma to Burden, Burden had driven the truck, and Appellant had been in the truck with Burden. Further, Appellant argues that he suffered prejudice because testimony about "[t]he [Facebook Live] video was the sole piece of evidence" corroborating Burden's accomplice testimony that Appellant participated in the Curry Street shooting. But the record belies this argument, as Burden's testimony about Appellant's involvement in the Curry Street shooting was adequately corroborated by Bergen, who was not an accomplice and who testified that Appellant had admitted doing "something terrible" and having "caught a body" on Curry Street. Accordingly, this claim fails. See *Durden v. State*, 318 Ga. 729, 733 (1) (899 SE2d 679) (2024) (no prejudice where the challenged testimony was cumulative of other admissible testimony).

5. Appellant argues that the trial court plainly erred in permitting Burden to testify to statements made by Daniels that implicated Appellant in Moore's murder because those statements were inadmissible hearsay. As explained below, this claim fails because Appellant has not shown a clear and obvious error in admitting the testimony.

By way of background, Burden testified at trial about statements Daniels had made to him about "[t]he Curry Street incident" while Appellant was with them. Specifically, Burden testified that Daniels had told him that "a burglary was committed on Curry Street," that "the homeowner was shot as he came back home and realized his house was being burglarized," that the homeowner was shot twice, and that Daniels "shot him" and Appellant also "fired a shot." Burden testified that, when Daniels talked about what happened on Curry Street, Appellant "was around[,] but he made no comment about doing it or knowing about it." And when asked if Appellant heard what Daniels told Burden about Curry Street, Burden speculated that "[t]here's a possibility

27

he didn't . . . because, I mean, I'm pretty sure he would have responded."

Admitting Daniels's out-of-court statements implicating Appellant in Moore's shooting did not constitute a "clear and obvious [error] beyond reasonable dispute" because there is a "reasonable argument" based on the record that those statements were admissible as adoptive admissions. *Carter*, 317 Ga. at 694-695 (2) (punctuation omitted). Georgia's Evidence Code provides that "[a] statement of which the party has manifested an adoption or belief in its truth" is considered an adoptive "admission" that "shall not be excluded by the hearsay rule." OCGA § 24-8-801 (d) (2) (B). "For evidence to qualify as a criminal defendant's adoptive admission under Rule 801 (d) (2) (B), the trial court must find that two criteria were met" — (1) "that the statement was such that, under the circumstances, an innocent defendant would normally be induced to respond," and (2) "that there are sufficient foundational facts from which the jury could infer that the defendant heard, understood, and acquiesced in the statement." *Wilkins v. State*, 308 Ga. 131, 134 (2)

28

(839 SE2d 525) (2020) (citation and punctuation omitted).

Here, the record authorized a determination by the trial court that, by failing to respond, Appellant adopted Daniels's statement that Appellant "fired a shot" at the homeowner during the Curry Street burglary. First, Daniels's statement accusing Appellant of "fir[ing] a shot" at a homeowner during the course of a burglary — an allegation that Appellant had engaged in serious criminal conduct — would normally prompt a person in Appellant's position to respond if he were innocent. See *Wilkins*, 308 Ga. at 135 (2) ("[A] statement referring to a bloody shirt in the trunk of the car . . . as the shirt 'we' used to wipe blood and fingerprints off a gun is the kind of statement that would normally prompt an innocent person to clarify that he was not part of the 'we.'"). Indeed, Burden seemed to acknowledge this fact, testifying that he would have expected Appellant to respond to Daniels's allegation upon hearing it. Second, although Burden speculated about "a possibility" that Appellant might not have heard Daniels's statement, the record supported a determination that Appellant heard, understood, and acquiesced in

29

the statement because, when asked if anyone was with Daniels when he shared the information about Curry Street, Burden responded, "Me, [Appellant,] and [another individual]." And Burden further testified that, despite being "around" when Daniels made the statement, Appellant did not "respond[ ]" and "made no comment about doing it or knowing about it." See id. at 135 (2) (concluding that the trial court reasonably concluded that the defendant heard, understood, and acquiesced in a statement incriminating the defendant when the defendant was nearby when the statement was made "[a]nd there [was] no indication that any particular circumstances impeded [the defendant] from speaking"). Because Appellant has not shown a "clear and obvious" error in admitting the testimony, this claim of plain error fails. *Carter*, 317 Ga. at 694 (2) (punctuation omitted).

6. Finally, Appellant argues that trial counsel was ineffective for failing to sever the counts charging Appellant with crimes connected to Moore's shooting on Curry Street from the other counts, which charged Appellant with crimes connected to the theft of the

Buick and the subsequent park shooting. We conclude, however, that this claim fails because Appellant has not established deficient performance.

The record shows that, before trial, Appellant's original defense attorney filed a motion to sever Appellant from his co-defendants. The original defense attorney was later replaced by Appellant's trial counsel. And during a pretrial motions hearing, trial counsel noted that he would review the original defense attorney's severance motion and determine whether the defense wanted to pursue it. But trial counsel did not raise the motion with the court again, and the record does not include a court ruling on the motion.

At the motion-for-new-trial hearing, Appellant's trial counsel explained that he knew Appellant's original defense attorney had moved to sever the defendants, that he believed that motion had been denied, and that he did not think "resurfacing the motion" was worthwhile. He further testified that he made a strategic decision not to move to sever the charges. He explained that he was confident

31

the jury would be able to separately assess the evidence regarding each charge, that he believed Appellant had "a very strong case" for "beating" all the charges because there "was hardly [any] evidence against him," and that he thought keeping the charges together would benefit Appellant because it would prevent the State from getting "multiple bites at the apple to get a conviction" through successive prosecutions. He also noted that, although he believed pretrial that the evidence against Appellant was insufficient, Bergen, who had not made any prior statements, testified at trial as "a last minute witness" and "tilted the scales" against Appellant.

To prevail on a claim that trial counsel was constitutionally ineffective, a defendant must show both deficient performance and prejudice. See *Monroe v. State*, 315 Ga. 767, 781 (6) (884 SE2d 906) (2023) (citing *Strickland v. Washington*, 466 U.S. 668, 687 (III) (104 SCt 2052, 80 LE2d 674) (1984)). To prove deficient performance, a defendant must establish that "his attorney performed at trial in an objectively unreasonable way considering all the circumstances and in the light of prevailing professional norms." *Pierce v. State*, 319 Ga.

32

846, 865 (11) (907 SE2d 281) (2024) (citation and punctuation omitted). "There is a strong presumption that counsel's representation was within the wide range of reasonable professional assistance." Id. (citation and punctuation omitted). And "[o]vercoming that presumption requires an appellant to show that no reasonable lawyer would have done what his lawyer did, or would have failed to do what his lawyer did not." Id. (citation and punctuation omitted). Establishing prejudice requires a defendant to "show that there is a reasonable probability that, but for counsel's deficiency, the result of the trial would have been different." *Zayas v. State*, 319 Ga. 402, 409 (3) (902 SE2d 583) (2024) (citation and punctuation omitted).

Here, Appellant argues that trial counsel lacked a strategic reason for deciding not to pursue a motion to sever the charges, and that trial counsel failed to do so only because he erroneously believed that the trial court had already denied a motion to sever the charges. The record, however, belies this contention. In his testimony at the motion-for-new-trial hearing, trial counsel carefully distinguished

between the decisions not to pursue a motion to sever *defendants* and a motion to sever *charges*. And while his testimony reveals that he may have been under the erroneous impression that the court had denied a motion to sever *defendants*, he did not testify that he believed the court had denied a motion to sever *charges*, much less that he decided not to file such a motion for that reason. Rather, trial counsel testified that he strategically decided not to move to sever the charges because he was confident that the jury could separately assess the evidence as to each charge, he believed Appellant had a good chance of beating the charges because the evidence against Appellant was weak, and he thought trying the counts together would benefit Appellant because it would prevent the State from getting multiple chances to obtain a conviction through successive prosecutions on different charges. Trial counsel's decision was objectively reasonable. See *DeLoach v. State*, 308 Ga. 283, 289 (2) (a) (840 SE2d 396) (2020) (no deficient performance where counsel chose not to move to sever believing that "his client was better served by capitalizing on the weaknesses in the State's case rather

34

than risking giving the State additional time to strengthen its case" as to certain of the charged offenses). Indeed, the trial record largely supported trial counsel's pretrial assessment of the case. Specifically, the fact that the jury acquitted Appellant of two charges demonstrates that jurors were able to separately assess the evidence as to each charge. See *Pinkins v. State,* 319 Ga. 595, 606 (3) (905 SE2d 596) (2024) (noting that the acquittal of a defendant on one charge but not others "indicates that the jury was able to distinguish the evidence and intelligently apply the law to each charge"). And the State's evidence as to many of the charges against Appellant was weak, as demonstrated by the jury's not-guilty verdicts on two of the charges and our conclusion above that, as to most of the counts, the evidence was insufficient under Georgia's accomplice-corroboration statute. Accordingly, this claim fails.

7. As explained above, we reverse Appellant's convictions on Counts 8, 9, 10, 12, and 15 because the trial evidence was not sufficient to support his convictions on those counts under Georgia's accomplice-corroboration statute. However, because we have

rejected Appellant's arguments challenging his conviction for felony murder, we affirm his conviction on Count 2.

*Judgment affirmed in part and reversed in part. All the Justices concur.*