NOTICE: This opinion is subject to modification resulting from motions for reconsideration under Supreme Court Rule 27, the Court's reconsideration, and editorial revisions by the Reporter of Decisions. The version of the opinion published in the Advance Sheets for the Georgia Reports, designated as the "Final Copy," will replace any prior version on the Court's website and docket. A bound volume of the Georgia Reports will contain the final and official text of the opinion.

In the Supreme Court of Georgia

Decided: March 17, 2026

S26A0399.  RAINEY v. THE STATE.

COLVIN, Justice.

Shadreen Rainey appeals from her convictions for felony murder, home invasion, and related offenses, in connection with the shooting death of Joshua Ellison and the shootings of Aldean Clark Kinsey and Elante Jose Elias Medina.[1] On appeal, Rainey argues

---

[1] The crimes occurred on February 4, 2021. On November 18, 2021, a Fulton County grand jury indicted Appellant for the felony murder of Ellison (Counts 1 and 2), aggravated assault with a deadly weapon of Kinsey and Medina (Counts 3 and 4), home invasion in the first degree (Count 5), false statement (Count 6), and possession of a firearm during the commission of a felony (Count 7). A jury trial was held from November 15 through 18, 2022, and the jury found Appellant guilty of all charges. The trial court sentenced Appellant to life in prison without the possibility of parole for felony murder (Count 1). The court also imposed ten-year consecutive terms in prison for each count of aggravated assault with a deadly weapon (Counts 3 and 4), a five-year consecutive prison term for possession of a firearm during the commission of a felony (Count 7), and concurrent prison terms of ten years and five years, respectively, for home invasion in the first degree (Count 5) and false statement (Count 6). The other felony-murder count (Count 2) was vacated by

that the trial evidence was not constitutionally sufficient to prove the "without authority" element of home invasion, that the trial court plainly erred in admitting testimony about what Rainey said during the shooting incident because the identifications of her voice were insufficiently authenticated, and that the trial court plainly erred in failing to instruct the jury on conspiracy as a lesser-included offense. As explained below, Rainey's arguments fail. We therefore affirm her convictions.

1. The trial evidence showed the following. The crimes occurred in a 12-room, two-story rooming house in Atlanta. At the time of the shooting, Appellant and her mother had lived in the rooming house for about a year, Kinsey had lived there for about seven months, and Medina had lived there for about five months.

Appellant and her mother rented separate bedrooms upstairs

operation of law. Appellant timely filed a motion for new trial on January 10, 2023, and amended the motion through new counsel on April 16, 2024, October 7, 2024, and May 26, 2025. Following a hearing, the trial court denied the motion for new trial, as amended, on July 14, 2025. Appellant timely filed a notice of appeal directed to this Court. The appeal was docketed to this Court's term beginning in December 2025 and submitted for a decision on the briefs.

in the rooming house. Kinsey rented a ground-floor bedroom adjacent to the front door. Medina rented a ground-floor bedroom connected to the kitchen. And the layout of the house allowed a resident standing at Medina's bedroom door to see through the kitchen, down a hallway containing Kinsey's bedroom door, and to the front door of the house.

About a month before the shooting, Kinsey's ex-girlfriend, Mayah Persons, moved into Kinsey's bedroom in the rooming house. Kinsey testified that, in the six months prior to Persons moving in with him, he and Appellant "were flirting and stuff." Kinsey said, "We talked. We kicked it. We smoked a couple." And according to Kinsey, the day before Persons moved in, he and Appellant were "going to her room," but he told Appellant that "we can't even do that" because Persons "was coming the next day."

Around that time, tension rose in the house. Medina testified that Appellant took issue with him after he ate some food that he believed Appellant's mother had given him, resulting in a verbal altercation. And Kinsey testified that, as soon as Persons moved in,

Appellant started "sizing her up" and "threatening" her, saying things like, "I'll beat any b up," and "I'll beat [any] ho a** up."

About a week before the shooting, Appellant's verbal threats prompted a physical fight between Appellant and Persons. Persons, who was winning the fight, ended up on top of Appellant. And Kinsey testified that he and Appellant's mother both intervened, with Kinsey grabbing Persons and Appellant's mother grabbing Appellant. According to Kinsey, Appellant's mother stumbled and fell down as she tried to pull Appellant away from Persons. But Appellant's mother testified that Kinsey "pushed [her] hard." And although Kinsey denied pushing Appellant's mother, Appellant accused him of doing so. Kinsey testified that, as Appellant was walking away from the fight, Appellant turned around and said, "Oh, I got you. I got you. I promise you, I got you."

A few days later, Appellant came into the house with a man who had a gun. Kinsey testified that Appellant took the gun from the man and said, "Talk s**t now." Kinsey told Appellant she was not going to shoot and walked back to his bedroom. But afterward,

Kinsey obtained a gun to protect himself.

Around 1:00 a.m. on the night of the shooting, Appellant arrived at the rooming house with two or three other people, one of whom was Appellant's ex-boyfriend, Ellison.[2] At the time, Kinsey was "having sexual relations" with Persons in his bedroom, and Medina was in the kitchen. Kinsey testified that he looked over to his window facing the front porch and saw the silhouettes of four people on the blinds. Kinsey testified that he heard more than one person enter the house through the locked front door, walk to the back of the house, and then return to his bedroom door. Medina testified that the people who entered the house included Appellant and a man with a gun, who walked together past him toward the back of the house and then walked back to the front of the house, where they stood outside Kinsey's bedroom door.

Kinsey said he "knew what [Appellant's] voice sounded like" because they "had been talking." And he testified that he heard Appellant say in a "very subtle" but audible "whisper," "His room is

_____

[2] The other person or two people were never definitively identified.

right here, and the other one is in the kitchen." Persons testified that Kinsey "immediately got up and started putting on his pants," and that while he was doing so, there was a knock at Kinsey's bedroom door. According to Kinsey, the man at the door addressed Kinsey by his nickname, "Twin," saying something along the lines of, "Hey, Twin, so, what's all this s**t I heard about … my sister getting a black eye, and you putting your hands on my mama?" Appellant responded, "Nah, bro. That ain't what happened." Before Kinsey could open the door, shots rang out and bullets that passed through the door hit him in the leg, causing him to fall backward.

After hearing the gunshots, Medina retreated to his bedroom and sat on his bed. Medina then heard a man ask, "Where's the other dude at?" And Medina testified that Appellant, whose voice he recognized from having "spoken to her … every other two or three days," said, "He's over there in that room right there."

Meanwhile, with Persons's assistance, Kinsey grabbed his gun and fired back "a couple times." Medina then heard footsteps approaching his room, and a man "came in the room" and "shot at

6

[him]," striking him twice in the leg.[3] Kinsey heard someone "bust into" Medina's room and shoot at him. And when Kinsey "hear[d] footsteps" coming back in his direction, Kinsey fired several more shots from inside his bedroom. Multiple bullet holes were later found in Kinsey's door, wall, and window. And Kinsey testified that the man who was later identified as Ellison walked through a glass door on the porch and collapsed in front of the house, where he died.[4] Kinsey said that the other people "ran and jumped in [a] car," and Appellant drove them away from the scene.

Appellant's aunt testified that Appellant, who went to live with her for a few weeks after leaving the rooming house, told her that Appellant's boyfriend (Ellison) went into the rooming house with a gun, that he harmed people, that someone shot him as he was leaving the house, and that Appellant then left the scene.

---

[3] A detective testified that Medina identified Ellison as the person who shot him. At trial, however, Medina testified that Ellison was not the man who shot him, and that the shooter also was not the man he had previously seen walk past him with Appellant.

[4] The medical examiner testified that Ellison died from a gunshot wound of the chest.

Appellant's mother similarly testified that "about 10 or 15" minutes after the shooting, Appellant called her, saying that Appellant had been "in the house." According to Appellant's mother, Appellant further said that "it [was]n't supposed to go that way," that Ellison "was supposed to stay in the car," and that Ellison was the one who asked, "Who pushed my mama[?]" A detective, who interviewed Appellant's mother on the day of the shooting, testified that Appellant's mother called Appellant on speakerphone in his presence. According to the detective, after Appellant's mother repeated what Appellant had told her about the crime, Appellant "scream[ed] at her mother, cuss[ed] her mother out," and said something to the effect of, "You just put in a murder. How could you do this?"

Cell phone records introduced into evidence at trial showed that, on the day of the shooting, Appellant's cell phone was in the sector of a cell phone tower covering the rooming house at 1:05 and 1:13 a.m., shortly before a different phone called 911 to report the shooting at 1:32 a.m. Appellant's cell phone records further showed

that, shortly before and shortly after that time period, Appellant's cell phone was in areas to the east of the rooming house covered by different cell phone towers. Finally, the cell phone records showed that cell service to Appellant's phone was terminated at 4:35 p.m. on the day of the shooting.

Officers who arrived at the crime scene found a total of ten cartridge cases, which had been fired from three different guns, one of which was Kinsey's and another of which was found near Ellison's body. The third gun was never recovered.

2. On appeal, Rainey argues that the trial evidence was constitutionally insufficient to prove the "without authority" element of home invasion in the first degree. See OCGA § 16-7-5(b) ("A person commits the offense of home invasion in the first degree when, *without authority* and with intent to commit a forcible felony therein and while in possession of a deadly weapon or instrument which, when used offensively against a person, is likely to or actually does result in serious bodily injury, he or she enters the dwelling house of another while such dwelling house is occupied by any

9

person with authority to be present therein." (emphasis added)). According to Appellant, she could not be found guilty of being a party to the crime of invading Medina's home because she was a resident of the rooming house with a key and had authority to enter it. See OCGA § 16-2-20(b)(3), (4) (providing that a person is a party to a crime if, among other things, the person "[i]ntentionally aids or abets in the commission of the crime" or "[i]ntentionally advises, encourages, hires, counsels, or procures another to commit the crime"). As explained below, however, Appellant's argument fails.

"Evidence is sufficient as a matter of constitutional due process if a rational trier of fact could have found the defendant guilty beyond a reasonable doubt." *Pierce v. State*, 319 Ga. 846, 849 (2024) (quotation marks omitted). "When reviewing the sufficiency of the evidence, we view the evidence in the light most favorable to the verdict, with deference to the jury's assessment of the weight and credibility of the evidence." Id. at 849–50 (cleaned up). And "[o]n appeal, it is the defendant's burden to show that the trial evidence was insufficient as a matter of constitutional due process." *Charles*

*v. State*, 315 Ga. 651, 653 (2023).

In relevant part, Count 5 of the indictment charged Appellant with committing home invasion in the first degree by "enter[ing] the dwelling house of" Medina "without authority." Although Appellant argues that the evidence showed that she had authority to enter the rooming house, the State's theory of the case (which it stated clearly in opening statements, in response to Appellant's motion for a directed verdict, and in closing arguments) was that Appellant had committed home invasion by being a party to the entry of Medina's *bedroom* — that is, Medina's specific dwelling — not the rooming house as a whole. And although Appellant argued below that Medina's bedroom did not constitute a "dwelling house" for purposes of the home-invasion statute, OCGA § 16-7-5(b), she has not raised that argument before us or otherwise made any effort to address that theory of the case on appeal.[5]

---

[5] In denying Appellant's motion for a directed verdict, the trial court rejected Appellant's argument that Medina's bedroom could not constitute a "dwelling house" for purposes of applying OCGA § 16-7-5(b). Because Appellant has not challenged that statutory-construction conclusion on appeal, we do not address it here.

11

Here, the trial evidence showed that Medina rented his own bedroom, and that neither Appellant, who rented a separate bedroom in the house, nor the man who Appellant directed to Medina's bedroom had authority to enter the bedroom for which Medina paid for exclusive use. The trial evidence was therefore constitutionally sufficient to prove that Appellant was a party to the entry of Medina's bedroom "without authority." OCGA § 16-7-5(b). And because Appellant argues on appeal only that the trial evidence was insufficient to prove the "without authority" element of home invasion, she has failed to carry her burden on appeal of showing that the trial evidence was insufficient as a matter of constitutional due process to support her conviction. See *Charles*, 315 Ga. at 653.

3. Appellant challenges the trial court's admission of Kinsey's and Medina's testimony identifying Appellant as the speaker who directed the shooters to their bedrooms. According to Appellant, Kinsey's and Medina's voice-identification testimony was insufficiently authenticated under OCGA § 24-9-901(a), which provides, "The requirement of authentication or identification as a

12

condition precedent to admissibility shall be satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims."

Appellant did not object to the admission of Kinsey's and Medina's voice-identification testimony at trial, so we review this claim only for plain error. See *Render v. State*, 320 Ga. 890, 899 (2025). To establish plain error, an appellant

> must point to an error that was not affirmatively waived, the error must have been clear and not open to reasonable dispute, the error must have affected his substantial rights, and the error must have seriously affected the fairness, integrity or public reputation of judicial proceedings.

Id. (quotation marks omitted).

Here, Appellant's plain-error claim fails because she has not shown any error in admitting the identifications of Appellant's voice. The Evidence Code provides that one way a person's voice can be identified is "by opinion based upon hearing the voice at any time under circumstances connecting it with the alleged speaker." OCGA § 24-9-901(b)(5). Here, testimony from Kinsey and Medina satisfied

13

that standard. As explained above, Kinsey and Medina, who both lived in the same house as Appellant, had frequent interactions with Appellant before the crimes occurred. According to Kinsey, he and Appellant were "flirting" over the course of several months, and he knew what her voice sounded like because they "had been talking." Medina similarly testified that he had talked to Appellant every two or three days, and that he had previously had a verbal altercation with her. Moreover, although Medina did not observe Appellant when she told someone where Medina's bedroom was located, he testified that he heard Appellant do so just after seeing her outside Kinsey's room. Accordingly, the evidence was more than "sufficient to support a finding that the matter in question [was] what its proponent[s] claim[ed]," namely, Appellant's voice. OCGA § 24-9-901(a). See *Edwards v. State*, 308 Ga. 176, 182 (2020) (holding that the evidence was sufficient to authenticate the appellant's voice where witnesses testified that they were familiar with the appellant's voice "from working with him" and from "in person

14

conversations with [him]").[6]

4. Finally, Appellant argues that the trial court plainly erred in failing to charge the jury that conspiracy is a lesser-included offense when a defendant is charged as a party to a crime. However, assuming without deciding that conspiracy was a lesser-included offense of any of the crimes charged here, this claim fails the plain-error test because Appellant did not request a jury instruction on conspiracy as a lesser-included offense. And as we have made clear, "the failure to charge on a lesser crime than the crime included in the indictment, without a written request by the State or the accused, is not error." *Lewis v. State*, 322 Ga. 683, 687 (2025) (quoting *Wipfel v. State*, 320 Ga. 84, 91 (2024)). Accordingly, this

---

[6] To the extent that Appellant contends that the identifications of Appellant's voice were insufficient because Kinsey and Medina had not previously heard Appellant's voice under the precise conditions present during the shooting incident, that argument goes to the weight of the evidence, not its admissibility. See *Henderson v. State*, 317 Ga. 66, 87 (2023) ("When authenticating evidence, the proponent must present sufficient evidence to make out a prima facie case that the proffered evidence is what it purports to be. Once that prima facie case is established, the evidence is admitted, and the ultimate question of authenticity is decided by the jury." (cleaned up)).

claim fails.[7]

*Judgment affirmed. All the Justices concur.*

---

[7] To the extent that Appellant raises a claim that trial counsel was ineffective for failing to request a jury charge on conspiracy, that claim is "procedurally barred" because she "failed to raise that claim at the motion-for-new-trial stage," when she had the assistance of new counsel. *Hardy v. State*, 317 Ga. 736, 741 n.10 (2023).