In the Supreme Court of Georgia

Decided: November 24, 2014

S14A0935.  DRAKE v. THE STATE.

HUNSTEIN, Justice.

Appellant Jamere Drake was convicted of felony murder and related

offenses in connection with the November 2011 shooting death of James Woods

in downtown Savannah.  Drake now appeals, contending that the trial court

erred in admitting his statements to police, which he alleges were obtained

through the use of improper interrogation techniques and in violation of

Miranda v. Arizona, 384 U. S. 436 (86 SCt 1602, 16 LE2d 694) (1966).  Finding

no error, we affirm.[1]

<hr>

[1] In February 2012, a Chatham County grand jury indicted Drake and co-indictee Jeremy Smith for malice murder, felony murder, attempted armed robbery, and two counts of possession of a firearm during the commission of a crime.  At the conclusion of a jury trial held October 24-26, 2012, Drake was acquitted of the malice murder charge but convicted on all other counts.  Smith had previously entered into a plea agreement.  The trial court sentenced Drake to life imprisonment for felony murder plus a consecutive five-year term for firearm possession and merged the remaining counts.  Drake filed a motion for new trial on November 9, 2012, which he amended on March 21, 2013.  Following a hearing in December 2013, the trial court denied the new trial motion on January 28, 2014.  Drake filed his notice of appeal on February 11, 2014.  The appeal was docketed to the April term of this

Viewed in the light most favorable to the jury's verdict, the evidence adduced at trial established as follows. In the early morning hours of November 19, 2011, James Woods, a taxi cab driver, was shot from behind and killed in the driver seat of his cab. A witness testified that, on the night in question, she returned to her home after midnight and noticed a taxi cab parked across the street. After going inside, she heard gunshots outside and saw the cab roll down the street and crash into a fence. The witness then saw a man on the passenger side of the car who appeared to be searching through the front seat of the cab. Another vehicle then approached, apparently startling the person, who ran from the scene. The witness called the police.

Savannah-Chatham County police arrived at the scene, where they found the dying victim, whom they were unable to revive. Investigators immediately contacted the taxi cab company to obtain the victim's identity and information about his final fare. Cell phone records obtained on an exigent basis reflected that the phone call requesting that final dispatch had come from a cell phone number registered to Drake. The records further revealed that two phone calls

Court and was thereafter submitted for decision on the briefs.

2

had been placed from Drake's cell phone number to the taxi cab company: the first shortly before midnight, using a "star six seven" prefix, which blocks the caller's identity from the receiving phone, and the second, three minutes later, without that prefix. Further evidence reflected that the taxi cab company's policy prohibited the dispatch of cabs to a caller who blocked his identity.

Having identified Drake, investigators located him that same morning at work at a local McDonald's. Drake accompanied them to the police station, where he underwent a series of video-recorded interviews, beginning at approximately 7:00 a.m. Drake first told investigators that, shortly before midnight on the previous night, he had been robbed at gunpoint of his cell phone, money, and the black thermal shirt he had been wearing. Drake subsequently admitted that this story was false and told the officers he had been driving around that night with an associate, Jeremy Smith. Drake stated that Smith had used Drake's cell phone to call a cab; that he dropped Smith off to catch the cab; and that he then received a call from Smith, who said the cab did not work out and asked Drake to pick him up at a nearby park. Drake further stated that he picked up his friend, who then told him he had shot the cab driver.

Drake subsequently changed his story again, admitting that he and Smith

3

had planned to go downtown to find someone to rob; that he had driven Smith, who had a gun, downtown; that he then changed his mind about participating in the robbery and thus dropped Smith off so that Smith could take a cab; and that he gave Smith his cell phone, which Smith used to call the cab company. Drake further stated that, after he dropped Smith off, he parked his car and heard gunshots, and that Smith called him a few minutes later asking to be picked up at a nearby park.

After Drake recited this version of events, he was placed under arrest and was read his Miranda rights, which he waived. He then repeated the most recent version of his account. Eventually, Drake indicated his desire to stop talking, and the investigator terminated the interview.

At this point, Drake and Smith were placed together in an interview room, where they were offered food and water. Unbeknownst to them, their interactions were recorded. Drake told Smith he was considering confessing and spoke of himself as an "accessory" to the crimes. After an hour, Drake asked to speak with one of the officers again, and, after being reminded of his Miranda rights, he told the officer that he and Smith had planned to rob a cab driver, with Smith committing the actual robbery and Drake being the getaway

driver. Drake admitted that he had called the cab company, dropped Smith off at the location to which the cab had been summoned, and picked Smith up at a nearby park after the robbery attempt. Drake also admitted that he knew Smith was armed with a nine-millimeter gun and that after the shooting he crushed his cell phone and threw it over a fence.

In a search of Smith's home, investigators uncovered a Smith & Wesson nine-millimeter firearm and nine-millimeter ammunition. Shell casings recovered from the victim's cab were later determined by a firearms expert to have been fired from this gun. In addition, clothing found at Smith's home matched that described by a witness who saw an individual fleeing the area after the shooting. One article of this clothing, a pair of jogging shorts, was stained with blood.

1. Though Drake has not enumerated the general grounds, we have concluded that the evidence as summarized above was sufficient to enable a rational trier of fact to conclude beyond a reasonable doubt that Drake was guilty of the crimes of which he was convicted. Jackson v. Virginia, 443 U. S. 307 (99 SCt 2781, 61 LE2d 560) (1979); see also OCGA § 16-2-20 (parties to a crime).

5

2. Drake contends that his statements to law enforcement officers were improperly admitted because the officers failed to inform him of his Miranda rights before they began interrogating him. See Reaves v. State, 292 Ga. 582 (2) (a) (740 SE2d 141) (2013) (Miranda warnings required before law enforcement authorities conduct a custodial interrogation). The trial court rejected this claim after holding a pre-trial Jackson-Denno[2] hearing, concluding that Drake was not in custody during the interview portion of his first interview and thus that no Miranda violation occurred.

On review of a ruling on a motion to suppress, this Court must affirm the trial court's findings on disputed facts and witness credibility unless they are clearly erroneous. See Reaves, 292 Ga. at 584. As to facts which are captured on recordings made part of the appellate record, our review is de novo. Mack v. State, S14A1168, slip op. at 6 (decided November 17, 2014); Reaves, 292 Ga. at 586. In all cases, we independently apply the law to the facts. Mack, S14A1168, slip op. at 6; Reaves, 292 Ga. at 584, 586. The admissibility of a defendant's statements is determined based on the totality of the circumstances.

---

[2] Jackson v. Denno, 378 U. S. 368 (84 SCt 1774, 12 LE2d 908) (1964)

Fennell v. State, 292 Ga. 834 (2) (741 SE2d 877) (2013).

"Miranda warnings are required only when a person is interviewed by law enforcement while in custody." Reaves, 292 Ga. at 584. One is considered to be "in custody" for Miranda purposes if he has been formally arrested or his "freedom of movement has been restrained to the degree associated with a formal arrest." Id.; accord Sosniak v. State, 287 Ga. 279 (1) (A) (1) (695 SE2d 604) (2010). The determination of custody in this context requires assessing whether a reasonable person in the suspect's situation would perceive that he was at liberty to terminate the interview and leave. Reaves, 292 Ga. at 584; Sosniak, 287 Ga. at 280.

At the Jackson-Denno hearing, Savannah-Chatham County police Sergeant Andre Jackson testified that once police had identified Drake as a person of interest, Jackson and two other investigators went to the McDonald's where Drake was employed. Jackson testified that they first approached the store manager and asked whether they could talk to Drake for "an hour or so," promising to bring him back afterwards. The manager agreed, and Jackson testified that "we told [Drake] that we were going to talk to him and bring him down and bring him back when we finished talking to him." Jackson further

7

testified that Drake was not handcuffed, was never threatened, and agreed willingly to accompany the officers, who transported him in the front seat of an unmarked patrol car. Jackson also testified that during the interview, Drake "was free to leave" and, if he had indicated his desire not to speak with police, they would have been required to let him go.

As reflected in the video recording, during the first interview, Drake was explicitly told he was not under arrest. The recording confirms that Drake was not handcuffed or physically restrained during the interviews and further reflects that the officers treated him with civility, provided him water and, at one point, food, and conducted the interviews in a calm, non-confrontational tone.

We conclude based on the totality of the circumstances that Drake was not in custody during his initial interview. The evidence reflects that investigators requested rather than demanded to speak with Drake and that Drake agreed voluntarily to accompany them to the police station, with the understanding that he would be returned to work thereafter. He was never physically restrained or threatened, was expressly told that he was not under arrest, and would have been free to leave if he had so requested. See Sosniak, 287 Ga. at 281-282 (defendant was not in custody where he was not physically restrained and was told he was

8

not under arrest; where he told police he expected to attend his college class the next day; and where police testified he was free to leave if he had so requested); see also Durden v. State, 293 Ga. 89 (3) (744 SE2d 9) (2013) (defendant was not in custody where he voluntarily rode with police to station to be interviewed, was told he was not under arrest, was not handcuffed, and was interviewed in an unlocked room); Fennell, 292 Ga. at 835-836 (defendant was not in custody where he chose to ride with police to station, was specifically informed he was not under arrest, and was never physically restrained); Reaves, 292 Ga. at 584-585 (defendant was not in custody at outset of interview, where, inter alia, she voluntarily agreed to ride to police station in front seat of unmarked patrol car). Though Drake contends that investigators had clearly targeted him as a suspect based on his link to the cell phone, the evidence reflects that police did not make the decision to arrest him until he had given his shifting accounts, on the basis of which they had also questioned Smith. Moreover, even if Drake had been a suspect at the time, this fact is not dispositive of the custody issue. See Sosniak, 287 Ga. at 280 (subjective views of the interrogating officer are not determinative of whether a suspect is in custody). Accordingly, the statements Drake made in his first interview, prior to being Mirandized, were properly

obtained and are admissible.[3]

3. Drake also contends that all of his statements were involuntary and should have been excluded from trial on this basis. Specifically, Drake criticizes the interrogating officers' pleas to him throughout the interviews to tell the truth; their exaggerations of the incriminating evidence police had gathered; the false representation that the victim had survived the shooting; and their insistence that they wanted to "help" Drake. However, none of the interview techniques utilized by the interrogating officers in this case were impermissible. There is no evidence that the officers ever offered Drake any leniency in charges or sentencing such as would amount to an improper hope of benefit under former OCGA § 24-3-50.[4] See Sosniak, 287 Ga. at 286 ("hope of benefit" generally refers to hope of a lighter punishment); see also Duke v. State, 268 Ga. 425 (2) (489 SE2d 811) (1997) (exhortations to tell the truth do not constitute

---

[3]Because there was no Miranda violation, there is no merit to Drake's further claim that the statements he made after being Mirandized were inadmissible under Missouri v. Seibert, 542 U. S. 600 (124 SCt 2601, 159 LE2d 643) (2004) (confession is inadmissible where given only after earlier confession obtained in violation of Miranda).

[4]Under the new Georgia Evidence Code, effective for trials commencing on or after January 1, 2013, this provision is codified at OCGA § 24-8-824.

impermissible hope of benefit). It is well established that artifice and deception do not render a statement involuntary so long as they are not calculated to procure an untrue statement. See, e.g., Daniel v. State, 285 Ga. 406 (5) (677 SE2d 120) (2009); Thorpe v. State, 285 Ga. 604 (6) (678 SE2d 913) (2009). Cf. State v. Ritter, 268 Ga. 108 (1) (485 SE2d 492) (1997) (where police deception misled defendant regarding charges he was facing and was employed specifically because of detective's belief that defendant would invoke right to remain silent if he were told the truth, such conduct offered an improper hope of benefit rendering defendant's statement involuntary). There is no evidence of excessively lengthy interrogation, physical deprivation, brutality, or other such "'hallmarks of coercive police activity.'" Fennell, 292 Ga. at 837. Under the totality of the circumstances, we conclude that Drake's statements to police were voluntary and properly admitted at trial.

Judgment affirmed. All the Justices concur.