312 Ga. 459
FINAL COPY

S21A0739.  TIDWELL v. THE STATE.

COLVIN, Justice.

Following a jury trial, Tonya Tidwell was convicted of malice murder and aggravated battery in connection with the death of David Eric Guice.[1]  On appeal, Tidwell claims that the trial court erred by failing to charge the jury on mutual combat and by failing to suppress evidence obtained during the post-incident search of the crime scene.  For the reasons set forth below, we affirm.

---

[1] On August 14, 2017, a Forsyth County grand jury indicted Tidwell, along with Ryan Spark and Jimmy Winkles, for the malice murder, felony murder, and aggravated battery of Guice. Tidwell was tried alone from November 5 through 13, 2018; the jury returned guilty verdicts on all charges. The trial court sentenced Tidwell to serve life in prison without the possibility of parole for malice murder and 20 years concurrent for aggravated battery; the trial court vacated the felony murder charge by operation of law.

Tidwell timely filed a motion for new trial on November 16, 2018, which she amended through new counsel on May 8, 2020.  After a hearing, the trial court denied the motion as amended on January 14, 2021.  Tidwell timely filed a notice of appeal.  The appeal was docketed to the April 2021 term of this Court, and oral argument was heard on May 20, 2021.

The evidence presented at trial showed that, on the evening of December 30, 2016, Forsyth County officers arrested Ryan Spark, Tidwell, and Michael Smith[2] for possession of methamphetamine after conducting a routine traffic stop. In addition to finding methamphetamine in the vehicle, officers located several knives, paracord (also known as parachute cord), and a machete; officers confiscated only the methamphetamine, however, as they had no reason or cause to seize the other items at that time.

Approximately one week later, on January 5, 2017, Forsyth County 911 received an anonymous call. The caller told the dispatcher that he had seen a body at an abandoned mobile home about two hours prior, that the body was located by the back door of the residence, and that it was wrapped in blankets. Responding officers entered the residence and found Guice's dead body under a pile of blankets by the back door. Officers exited the mobile home,

---

[2] Smith was not charged in Guice's murder as, by all accounts, he was merely present when the defendants showed up at the mobile home and murdered Guice.

notified dispatch of their discovery, and obtained a search warrant.[3]

During a subsequent search of the mobile home, the crime scene investigator noted that Guice had rope tied around his neck and his left hand. Similar rope was found wrapped around the handle of the mobile home's back door. There was blood throughout the mobile home along with bloody drag marks, indicating that Guice had been dragged to different locations while bleeding. Drywall had been removed in sections of the mobile home, a section of the carpet had been cut out, and a pile of bloody towels was located in the closet behind the door of the master bedroom. Officers found a pair of Nike shoes on the floor of the master bedroom, an orange pipe,[4] a blood-stained gray hoodie, a white glove in a trash bag, and a broom that had blood on the handle.

The coroner noted multiple injuries to the back of Guice's head, numerous injuries to his face, and cut marks to his hands. After conducting an autopsy, the medical examiner opined that Guice had

---

[3] Officers obtained search warrants for all subsequent searches of the home and for seizures of evidence.

[4] This was also described at trial as an orange pole.

3

suffered several stab wounds as well as blunt force trauma all over his body. The medical examiner concluded that Guice died as a result of stab wounds to the neck and torso and multiple blunt force injuries.

Officers learned the identity of the January 5 tipster (Cameron McCallum) and interviewed him as a potential suspect. McCallum implicated Tidwell, Spark, and Jimmy Winkles in Guice's death. Spark and Winkles were arrested at their respective residences. Officers searched Spark's home and located a bloody towel behind a bedroom door. Spark's white Dodge Ram, which was parked outside the residence, was seized and transported to the sheriff's office. During a search of the vehicle, officers found an empty water jug and a fixed-blade knife. Spark and Winkles were interviewed by officers; they confessed their involvement in Guice's murder and implicated Tidwell. Michael Smith was also interviewed, and he, too, implicated Tidwell, Spark, and Winkles in Guice's murder. Tidwell, who had not made bond from the drug arrest, was interviewed at the jail; she admitted to participating in Guice's killing. Also, while

4

incarcerated, Tidwell admitted to fellow inmate, Christine Dutton, that she had beaten, robbed, and murdered a man because he had "ripped her off." Tidwell told Dutton she was going to claim at trial that she had been raped in order to avoid conviction.

After their interviews, officers took the defendants' clothing and collected buccal swabs. Blood was found on all of the defendants' shoes and was later matched to Guice's DNA. A swabbing from the orange pipe found at the scene also contained Guice's DNA. Officers returned to the crime scene to search for additional evidence based upon the new information they obtained during the defendants' interviews. Inside the mobile home, officers collected a milk jug, some paracord, a hammer, and a door that did not belong to the residence.

Spark and Winkles pled guilty prior to trial and testified as witnesses for the State.[5] Specifically, Spark and Winkles told the

---

[5] Smith was also called as a witness and testified about what he saw take place inside the mobile home, which largely tracked Spark's and Winkles' testimony.

jury that, on the day of the crimes, they were with Tidwell and had been using drugs when the group realized they were all mad at Guice for various reasons.[6] The group decided to confront Guice over their respective grievances, so they drove to his mobile home and, when they entered the residence, they found Smith and Guice asleep. Although Smith woke up, Guice remained passed out in his bed. The group smoked some meth and decided that they needed to beat up Guice and "make him pay" for what he had done. Tidwell went into the bedroom where Guice was still sleeping, picked up a hatchet, and hit Guice in the head with the blunt side of the hatchet three or four times. Guice jumped up, and the group began beating him with heavy objects, such as a barbell and the orange pipe. Guice tried to defend himself and swung at his attackers, but he could not ward off the three by himself. Eventually, Guice fell to the ground, but he was able to grab a nearby door that was not hinged to the frame and pulled it over himself as a shield. Winkles pulled the door

---

[6] The record shows that Spark and Winkles believed Guice had stolen from them, and Tidwell was angry at Guice from a prior physical altercation.

away; Guice tried to hit back, but Winkles punched Guice unconscious.

After a period of time, Guice regained consciousness, got up off the ground, and started swinging at Tidwell, who still had the hatchet in her hands. Tidwell, Spark, and Winkles resumed beating Guice with heavy objects (the hatchet, barbell, and a piece of lumber). Guice once again grabbed the door and used it as a shield while swinging it at his attackers, but the group was able to knock the door away and continue beating Guice. He fell unconscious again. After approximately fifteen minutes, Guice regained consciousness, and the group once again beat him with heavy objects. They eventually backed him into the kitchen corner and yelled at him for the wrongs he had allegedly committed. Guice apologized and offered to pay them back, but Tidwell exclaimed that she wanted to kill him. She ran into the bedroom, returned with a knife, and started punching, stabbing, and kicking Guice. She then grabbed some paracord, bound Guice's hands behind his back, and stabbed him again before cutting the paracord.

Guice did not regain consciousness again. Spark testified that he could hear Guice's shallow breathing, and it sounded as if he had "a bunch of fluid in his lungs." Tidwell removed Guice's jeans and told Spark to look through the pockets. During this time, Tidwell took a nearby broom and put it up Guice's rectum. Spark walked outside for a moment, and Winkles went into the bedroom where Smith was sitting. Tidwell closed the door to the bedroom, stating, "Y'all probably don't want to hear this." Winkles then heard a loud bang and something rattling on the floor. Smith heard gurgling coming from the kitchen, and Spark announced that Guice was "cold."

Tidwell, Winkles, and Spark cleaned the crime scene, cut out the blood-stained drywall, cut out a piece of bloody carpet, and started a fire in the back yard so they could destroy the evidence. Tidwell had jugs of water in the house and used them to clean the scene, including her shoes, clothes, the hatchet, barbell, and orange pipe. At this point, Winkles decided he no longer wanted to be a part of the crimes and left the mobile home. Spark and Tidwell covered

8

Guice's body in blankets. Tidwell changed out of her blood-covered Nike sneakers and her gray hoodie. She left the mobile home with Spark and Smith, and the three were on their way to take Smith home when they were pulled over by police. Spark testified that, after they were arrested on the drug charges, Tidwell told Spark to go back to the scene and "clean up the mess."[7]

1. Tidwell argues that the trial court erred by failing to instruct the jury on mutual combat. Assuming without deciding that this claim was preserved for ordinary appellate review, it fails because Tidwell cannot show that the trial court erred by ruling that there was no evidence to support a charge on mutual combat. "To authorize a requested jury instruction, there need only be slight evidence to support the theory of the charge, and the necessary evidence may be presented by the State, the defendant, or both." (Citation and punctuation omitted.) *Collins v. State*, 308 Ga. 515, 519 (2) (842 SE2d 275) (2020). "Whether the evidence presented is

---

[7] Spark was released on bond a day later, but he did not return to the crime scene.

sufficient to authorize the giving of a charge is a question of law." (Citation and punctuation omitted.) *McClure v. State*, 306 Ga. 856, 863 (1) (834 SE2d 96) (2019).

Tidwell argues that she has met this standard because Spark testified that Guice charged toward Tidwell and her co-defendants each time he regained consciousness. However, "[t]he essential ingredient, mutual intent, in order to constitute mutual combat, must be a willingness, a readiness, and an intention upon the part of both parties to fight." (Citation and punctuation omitted.) *Berrian v. State*, 297 Ga. 740, 743 (2) (778 SE2d 165) (2015). "Reluctance, or fighting to repel an unprovoked attack, is self-defense, and is authorized by the law, and should not be confused with mutual combat." (Citation and punctuation omitted.) Id. Here, there is no evidence of an agreement, willingness, or readiness to fight between Guice and any of his attackers. Instead, the evidence, including Spark's testimony, showed that Guice was ambushed by Tidwell, Spark, and Winkles while he slept; that he was brutally beaten by his attackers; and that, despite his numerous attempts to protect

himself from the blunt force objects hitting him, Guice was eventually bound and stabbed to death. Based on the foregoing, we conclude that the trial court did not err in denying Tidwell's requested charge of mutual combat.

2. Tidwell also argues that the trial court erred by denying her pretrial motion to suppress evidence obtained at the crime scene after officers' initial warrantless entry into the mobile home, arguing that there were no exigent circumstances that would have excused officers from obtaining a search warrant.[8] "On reviewing a trial court's ruling on a motion to suppress, evidence is construed most favorably to uphold the findings and judgment and the trial court's findings on disputed facts and credibility must be accepted unless clearly erroneous." (Citation and punctuation omitted.) *Scandrett v. State*, 293 Ga. 602, 603 (2) (748 SE2d 861) (2013).

The record shows that the trial court held a hearing on Tidwell's motion to suppress wherein the State called the three

_____

[8] We assume without deciding that Tidwell had standing to challenge the search of the mobile home.

11

officers that responded to the initial 911 call. One of the officers testified that he got information from dispatch concerning an anonymous call "that there's possibly a body at an abandoned [mobile home] somewhere off of Pea Ridge Road" in Forsyth County. The caller did not give an address but did provide a description of the property. Based upon the officers' prior dealings with the area, they determined that the tipster was referring to Guice's mobile home. The mobile home was familiar to officers because they had responded to previous calls at that residence for "verbal disputes" including "a lot of yelling and arguing." Another officer testified that, "with the information we have, we are there to render aid if someone is in there and still alive. So our main priority is to render aid if we can."

When officers arrived, they knocked on the door and announced who they were but received no answer. At that time, officers noticed that the front door was unsecure and that there were pry marks around the door handle. They opened the front door and announced themselves again but received no response. Officers checked the

residence and observed a large pile of blankets in the corner of the kitchen. When they moved one of the blankets, officers saw a human leg with obvious signs of lividity. At this point, the responding officers stopped what they were doing, exited the residence, and notified dispatch. Thereafter, officers obtained search warrants for all subsequent entries and searches of the home.

After hearing the evidence, the trial court denied Tidwell's motion, ruling, in pertinent part, "that the initial warrantless entry was justified in light of the objectively reasonable basis that someone inside may be in need of immediate aid." Tidwell argues that the trial court's ruling was erroneous because the State failed to show that the warrantless search fell within the "emergency aid" exception to the warrant requirement. We disagree.

"The Fourth Amendment proscribes all unreasonable searches and seizures, and searches conducted without prior judicial approval are per se unreasonable under the Fourth Amendment, subject to specifically established and well-delineated exceptions." *Teal v. State*, 282 Ga. 319, 322-323 (2) (647 SE2d 15) (2007). One such

exception to the Fourth Amendment's warrant requirement, as recognized by the United States Supreme Court, is "that the Fourth Amendment does not bar police officers from making warrantless entries and searches when they reasonably believe that a person within is in need of immediate aid." *Mincey v. Arizona*, 437 U. S. 385, 392 (I) (98 SCt 2408, 57 LE2d 290) (1978). This is so because "[t]he need to protect or preserve life or avoid serious injury is justification for what would be otherwise illegal absent an exigency or emergency." (Citation and punctuation omitted.) Id. "Accordingly, law enforcement officers may enter a home without a warrant to render emergency assistance to an injured occupant or to protect an occupant from imminent injury." *Brigham City v. Stuart*, 547 U. S. 398, 403 (II) (126 SCt 1943, 164 LE2d 650) (2006).[9]

The crux of Tidwell's argument is that, because the initial 911 caller only notified officers of a "body" inside a mobile home, officers

---

[9] We note that the State did not seek to invoke the distinct "community caretaking" exception addressed in the United States Supreme Court's recent opinion in *Caniglia v. Strom*, ___ U. S. ___ (141 SCt 1596, 209 LE2d 604) (2021).

14

did not have enough information that the person inside was in need of immediate aid. However, "[o]fficers do not need ironclad proof of a likely serious, life-threatening injury to invoke the emergency aid exception." (Punctuation omitted.) *Michigan v. Fisher*, 558 U. S. 45, 49 (130 SCt 546, 175 LE2d 410) (2009). The test, as explained by the Supreme Court, "is not what [officers subjectively] believed, but whether there was 'an objectively reasonable basis for believing' that medical assistance was needed, or persons were in danger." Id. (quoting *Brigham City,* supra*,* 547 U. S. at 406 and *Mincey,* supra*,* 437 U. S. at 392). Here, the record shows that officers received a tip about a *possible* dead body inside a mobile home; had responded to the residence on prior occasions for verbal disputes; and that, after knocking on the front door and receiving no response, officers noticed that the front door was unsecure and that there were pry marks near the door handle. Based on the foregoing, we agree with the trial court that it was objectively reasonable for the officers to believe that a person inside the mobile home was "seriously injured or imminently threatened with such injury." *Brigham City,* supra*,*

15

547 U. S. at 400.  See also *Teal*, supra, 282 Ga. at 322 (emergency aid exception applied to initial entry into motel room by officers responding to a call reporting a "bound, motionless body" visible through the room's window).  Consequently, the trial court did not err in denying Tidwell's pretrial motion to suppress.

*Judgment affirmed.  All the Justices concur.*

Decided September 21, 2021.

Murder. Forsyth Superior Court. Before Judge Bagley.

*Clark & Towne, David E. Clark*, for appellant.

*Penny A. Penn, District Attorney, Sandra A. Partridge, Assistant District Attorney; Christopher M. Carr, Attorney General, Patricia B. Attaway Burton, Deputy Attorney General, Paula K. Smith, Senior Assistant Attorney General, Matthew B. Crowder, Assistant Attorney General*, for appellee.