**NOTICE: This opinion is subject to modification resulting from motions for reconsideration under Supreme Court Rule 27, the Court's reconsideration, and editorial revisions by the Reporter of Decisions. The version of the opinion published in the Advance Sheets for the Georgia Reports, designated as the "Final Copy," will replace any prior version on the Court's website and docket. A bound volume of the Georgia Reports will contain the final and official text of the opinion.**

In the Supreme Court of Georgia


Decided: June 24, 2025


S25A0360. QUINTANAR v. THE STATE.


ELLINGTON, Justice.

Abraham Quintanar appeals his convictions for felony murder and other crimes in connection with the shooting death of Marcus Gilead and the attempted armed robbery of Ciavy Wiles.[1] Quintanar

---

[1] The crimes occurred on February 10, 2020. On December 4, 2020, a Gwinnett County grand jury indicted Quintanar, Miguel Angel Gonzalez, and Sebastian Resendiz-Garcia for two counts of felony murder, two counts of aggravated assault with a deadly weapon, two counts of criminal attempt to commit armed robbery, and one count of possession of a firearm during the commission of a felony. Quintanar alone was charged with possession of a handgun by a person under the age of 18 years. Quintanar was tried separately at a jury trial that ended on February 29, 2024, and he was found guilty on all counts. On March 4, 2024, Quintanar was sentenced to serve life in prison with the possibility of parole for felony murder predicated on the aggravated assault of Gilead, a consecutive five-year prison term for possession of a firearm during the commission of a felony, concurrent 20-year prison terms for the aggravated assault and attempted armed robbery of Wiles, and a concurrent 12-month prison term for possession of a handgun by a person under the age of 18 years. The other felony murder count was vacated by operation of law, and the remaining counts were merged into the felony murder for which Quintanar was sentenced. We have identified a sentencing error that we correct in Division 7. Quintanar filed a timely motion for new trial, which he amended

contends that the trial court erred by admitting his custodial statement, admitting testimony about a video recording that was not introduced into evidence, refusing to allow certain impeachment of a witness, and failing to give requested jury charges related to justification and mutual combat. Quintanar also contends that certain portions of the State's closing argument amounted to plain error and that the cumulative effect of the enumerated errors prejudiced him. Although we vacate Quintanar's conviction and sentence for aggravated assault because it should have merged with his conviction for attempted armed robbery, we otherwise affirm Quintanar's convictions for the reasons explained below.

The evidence presented at trial showed that co-indictees Quintanar, Sebastian Resendiz-Garcia, and Miguel Angel Gonzalez attempted to rob Gilead and Wiles at gunpoint, that Quintanar and Gilead fought and struggled for control of Quintanar's gun, and that

through new counsel on March 14 and September 3, 2024. The trial court denied Quintanar's amended motion for new trial on September 16, 2024. Quintanar filed a timely notice of appeal, and the case was docketed in this Court to the term beginning in December 2024 and submitted for a decision on the briefs.

Quintanar then shot and killed Gilead.

On February 10, 2020, Quintanar, Resendiz-Garcia, and Gonzalez planned to rob Gilead where he lived with his mother and brother. The co-indictees understood that Gilead was a drug dealer and in possession of drugs and money because Gonzalez had purchased marijuana from him earlier in the day. Gonzalez paid about $600 for three to four ounces of marijuana, which Gilead retrieved from a duffel bag in his vehicle.

The three co-indictees drove to Gilead's house but parked some distance away. Wiles and Gilead were "hang[ing] out" in Gilead's car, parked in his driveway, and Wiles was watching a game on his phone while Gilead dozed off. Each of the co-indictees possessed a gun and wore a mask during the attempted robbery. At approximately 8:00 p.m., two of them approached the driver's side of Gilead's vehicle while Gilead was asleep in the driver's seat, and one co-indictee approached the passenger's side while Wiles was in the front passenger seat. The three co-indictees pointed their firearms at Gilead and Wiles and knocked on the windows of both

3

sides of the car. Gilead picked up a machete that was in the car, but Wiles told Gilead not to get the machete. The co-indictees forced Gilead and Wiles out of the vehicle and asked where the bag of marijuana was. Resendiz-Garcia began searching the vehicle.

After Wiles showed the co-indictee on his side of the vehicle he had nothing in his pockets, a gunshot from Gilead's side of the vehicle distracted that co-indictee and gave Wiles an opportunity to run away from the scene. Resendiz-Garcia heard a shot and fired his 9mm Taurus pistol as he fled, and Quintanar and Gonzalez also discharged their firearms. Gilead struggled with Quintanar and tried to disarm him, but Quintanar regained control of his gun and shot at Gilead multiple times. After Quintanar fled, he disposed of his weapon by throwing it into a sewer.

Gilead's mother, who was inside the house, heard three gunshots and opened her front door. She saw Gilead bent over, and he kept telling his mother he felt tired. As Gilead moved towards his mother, she could see a young man, whom Gilead's mother later identified as Gonzalez, holding a gun to Gilead's back. Gilead's

mother then put herself between them and, not knowing that Gilead had already been shot, begged the man not to shoot. Gilead collapsed onto the floor with blood on his chest, and the other man fled. Gilead later died from a single gunshot that entered the front of his chest and exited through his back.

A total of five shell casings were recovered at the scene: four 9mm casings and one .40-caliber casing. One 9mm casing was in the driveway on the driver's side of the vehicle; two 9mm shell casings were in the bushes near the front door; one 9mm shell casing was between the vehicle and garage door; and one .40-caliber shell casing was in a driveway across the street. The four 9mm shell casings were fired from the same gun. When Resendiz-Garcia was arrested at his home, officers recovered a loaded brown Taurus 9mm handgun. Other evidence discovered at the scene included a bullet hole in the garage door, 1.4 pounds of marijuana in the garage, a black "sock hat" and black ski mask in the yard, marijuana and a machete in the vehicle, a black folding knife on the ground, and Gilead's wallet in the house containing $2,328 in cash.

Law enforcement learned from Resendiz-Garcia of Quintanar's and Gonzalez's involvement in Gilead's murder and took out warrants for their arrest. On February 13, 2020, Officer Johnathon Bucknor stopped a vehicle carrying Quintanar and others, and Quintanar fled the scene, leaving a firearm behind. Law enforcement eventually located Quintanar the next day and took him into custody. During a police interview, Quintanar, who was 15 years old at the time, stated that he and his two co-indictees ran up on the victims to commit the armed robbery; Quintanar initially pointed a 9mm Jimenez firearm at the passenger; after Gilead got out of the car, he "tackled" Quintanar and "grabbed the gun from [him]"; Quintanar "thought [Gilead] was going to shoot me"; Gilead "pistol-whipped" Quintanar five times and pointed the gun at him; Quintanar grabbed the gun back, "wrestled" on the ground with Gilead over the gun, regained control of it, and shot Gilead; Gilead's mother came out and said "don't kill me; don't kill him"; and – contrary to the identification of Gonzalez by Gilead's mother – only she and Quintanar were still there with Gilead because Wiles and

the two co-indictees had left.

1. Quintanar contends that the admission of his custodial statement to law enforcement officers after his arrest when he was a minor was a violation of due process under the United States Constitution because the statement was not voluntarily made. In support of this contention, Quintanar complains that, before being advised of the charges against him, Detective Dennis Hennelly told him that he was going prison for the rest of his life "because you want to say you were not there," in reference to Gilead's shooting. Quintanar argues that Detective Hennelly was not simply informing Quintanar of his potential sentence, but instead made the life sentence a consequence of his statement rather than his charges, and implied that he would not spend the rest of his life in prison if he changed his statement.[2] Quintanar also complains of his mother's

---

[2] Quintanar does not make a separate statutory argument that his confession was induced by a hope of benefit. Although Quintanar's appellate brief references case law related to such statutory claims, he does not cite the relevant statute, OCGA § 24-8-824, which provides that, "[t]o make a confession admissible, it shall have been made voluntarily, without being induced by another by the slightest hope of benefit or remotest fear of injury."

absence for four hours and the officers' repeated misrepresentations that both of his co-indictees and the victim's mother had identified him when Resendiz-Garcia was the only one who had implicated

---

Quintanar treats the hope-of-benefit principle as auxiliary to his constitutional claim. This treatment is consistent with his failure to preserve the statutory issue in the trial court for ordinary appellate review. An objection to evidence on constitutional grounds does not preserve a related statutory ground for review. See, e.g., *Johnson v. State*, 294 Ga. 86, 87-88 (2) (750 SE2d 347) (2013) (holding that objection to evidence on Confrontation Clause grounds does not preserve for review a hearsay objection to the same evidence). Quintanar preserved his contention that his custodial statement was involuntary in violation of the Fifth and Fourteenth Amendments to the United States Constitution. But he did not raise the statutory claim that his statement was induced by a hope of benefit or fear of injury in his written motion, at the pre-trial hearing on the motion, or when the statements were ultimately introduced into evidence. See *Turner v. State*, 287 Ga. 793, 794 (2) (700 SE2d 386) (2010) (similarly explaining that the appellant waived his claim based on the predecessor of OCGA § 24-8-824 even though he preserved his federal constitutional voluntariness claim).

We have explained that statutory hope-of-benefit claims are distinguished from constitutional voluntariness claims, though our own decisions have sometimes conflated the two. See *Matthews v. State*, 311 Ga. 531, 542 (3) (b) (858 SE2d 718) (2021); *State v. Chulpayev*, 296 Ga. 764, 779 (3) (b) (770 SE2d 808) (2015). Yet, again, Quintanar makes no separate statutory argument. He does not make any argument that the portion of the statute requiring the statement to be voluntary – apart from the specified "hope of benefit" or "fear of injury" – means something more than the federal due-process voluntariness requirement. Nor does he argue that his statement was induced by hope of benefit or fear of injury as set forth in the statute. However, Quintanar does specifically rely on the principle that a promise falling short of a "hope of benefit," "particularly if it is broken, could be one of the totality of circumstances that renders a confession involuntary and inadmissible as a violation of constitutional due process." *Brown v. State*, 290 Ga. 865, 871 (2) (d) (725 SE2d 320) (2012). Accordingly, we consider the circumstance of Detective Hennelly's statement as part of our due-process analysis below.

Quintanar. We conclude that the trial court did not err in determining that the totality of the circumstances showed that Quintanar's custodial statement was voluntary.

"In determining whether a defendant's statement was voluntary as a matter of constitutional due process, a trial court must consider the totality of the circumstances," with the State bearing the "burden of demonstrating the voluntariness of [the] statement by a preponderance of the evidence." *Matthews v. State*, 311 Ga. 531, 540 (3) (a) (858 SE2d 718) (2021) (citation and punctuation omitted). See also *Clark v. State*, 315 Ga. 423, 429 (3) n.9 (883 SE2d 317) (2023) (noting that we have applied the "totality-of-the-circumstances test in evaluating whether a juvenile's statement to law enforcement officials was voluntarily made as a matter of due process"). "[P]roper application of a totality-of-the-circumstances test mandates . . . inquiry into *all the circumstances* surrounding the interrogation." *Clark*, 315 Ga. at 434 (3) (b) (citation and punctuation omitted; emphasis in original) (citing cases discussing the test in a variety of contexts). Thus, lists of specific

factors that we have previously considered "are neither required nor exhaustive." *State v. Franklin*, 318 Ga. 39, 42 (3) n.6 (897 SE2d 432) (2024) (involving factors we have considered in determining whether the statement made by an adult defendant while intoxicated or under the influence of drugs was voluntary as a matter of constitutional due process). See also *Clark*, 315 Ga. at 429 (3), 434-435 (3) (b) & n.16 (stating that "any prescriptive or fixed list of factors by its very nature risks undermining a totality-of-the-circumstances test" and disapproving any language in prior cases indicating that a specific nine-factor framework to determine whether a juvenile knowingly and voluntarily waived his *Miranda* rights is required or exclusive, as well as cases involving the issue of whether a statement was voluntarily made as a matter of due process).

As we recently clarified, however, "the totality-of-the-circumstances standard we use to evaluate voluntariness claims includes" the necessary predicate of coercive police activity. *Franklin*, 318 Ga. at 42-43 (3) (relying on *Colorado v. Connelly*, 479

10

U. S. 157, 164-167 (107 SCt 515, 93LE2d 473) (1986)). "Coercive police activity—such as excessively lengthy interrogation, physical deprivation, and brutality—is a necessary predicate to the finding that a confession is not voluntary within the meaning of the Due Process Clause of the Fourteenth Amendment." *Dozier v. State*, 306 Ga. 29, 36 (4) (c) (829 SE2d 131) (2019) (citations and punctuation omitted). And "[i]t is well established that artifice and deception do not render a statement involuntary so long as they are not calculated to procure an untrue statement." *Drake v. State*, 296 Ga. 286, 290 (3) (766 SE2d 447) (2014).

Generally, when reviewing the voluntariness of a defendant's statement, which is "a mixed question of fact and law, we accept the trial court's finding on disputed facts and credibility of witnesses unless clearly erroneous but independently apply the law to the facts." *Matthews*, 311 Ga. at 540 (3) (a) (citation and punctuation omitted).

> We have previously explained that when reviewing a trial court's ruling on a suppression issue, an appellate court must construe the evidentiary record in the light most

11

favorable to the factual findings and judgment of the trial court. In cases where some or all of the material facts are undisputed, we properly may take notice of the undisputed facts — even if the trial court did not — without interfering with the prerogative of the trial court to resolve disputes of material fact.

*State v. Tripp*, 320 Ga. 536, 547-548 (2) (910 SE2d 587) (2024) (citation and punctuation omitted). "Such undisputed facts include, among other things, those which definitively can be ascertained exclusively by reference to evidence that is uncontradicted and presents no questions of credibility. Audio or video evidence may match that description." *Franklin*, 318 Ga. at 39 (1) n.1 (citation and punctuation omitted). See also *State v. Leverette*, 320 Ga. 806, 809-810 (2) (912 SE2d 533) (2025). Thus, the video recording of Quintanar's interview – which was admitted at the hearing on Quintanar's motion to suppress and at trial and was played for the jury – may be considered to the extent that there is no dispute about what happened or what words were said during the interview, while any findings the trial court made in resolving disputes of material fact must be reviewed for clear error. "Finally, we review de novo the

application of the facts to the law — that is, the trial court's ultimate conclusion whether, under all the circumstances, the defendant's statement was voluntary." *Tripp*, 320 Ga. at 548 (2) (citation and punctuation omitted).

The trial court here made no findings at the hearing on Quintanar's motion to suppress and subsequently issued a written order finding, in relevant part, only that, "under the totality of circumstances, [Quintanar's] statement was voluntarily and freely made[.]" The parties have not raised any dispute about the words or the conduct occurring in the recorded interview or about any other evidence related to the interview. Indeed, Quintanar states that the evidence presented at the hearing "was not disputed" and that "the controlling facts can be determined exclusively by reference to evidence that is uncontradicted and presents no questions of credibility."

The video recording of Quintanar's interview shows that police officers slowly reviewed the waiver-of-rights forms for a juvenile, Quintanar indicated he understood the forms, and he signed them.

13

Quintanar declined to continue without a parent, confirmed that he would talk with officers if his mother was present, and gave them her contact information. The interview was then suspended. About two hours later, officers told Quintanar that they were still trying to contact his mother. Quintanar asked what would happen if his mother was not able to come to the police station that day. Officers explained that, because he was being held on "adult charges," they would first "have to take you over to the jail, and you're going to get booked in, and then you'll see a judge and then from there you'll go to our YDC [Youth Detention Center]." Quintanar asked whether the interview would happen if his mother did not come, officers explained it was his choice, and he said he would "go ahead with the interview . . . I don't really care."

The officers left the interview room but later returned and confirmed that Quintanar wanted to speak with them without his mother present and understood all of the rights that had been explained to him. Quintanar denied his presence and involvement in a shooting with his friends. The officers told Quintanar that

14

Resendiz-Garcia and Gonzalez had told them everything they and Quintanar did and that the victim's mother gave a very good description of Quintanar, but Quintanar continued to deny his presence. Detective Hennelly later told Quintanar the story that Resendiz-Garcia provided. Detective Hennelly stated he did not believe Quintanar's explanation that he was not at the crime scene. Detective Hennelly stated that Quintanar was being charged as an adult, his friends would testify against him, and "you are going to go to jail for the rest of your f**king life for some bulls**t because you want to say you weren't there."

Quintanar did not react or change his statement at that time. Instead, he reviewed a document with his charges on it and had a long discussion with Investigator Yayoi Huggins unrelated to the shooting. Quintanar later said he was aware of the shooting because he heard about it on the news, but he continued to insist he was not there, and he told Investigator Huggins that they had the wrong person. Investigator Huggins told Quintanar "everything you're saying now isn't going to look good" because there were "three people

saying that it was you," as well as other evidence, but Quintanar remained silent and requested water, and Investigator Huggins left the room.

When Investigator Huggins returned, she and Quintanar discussed the visitation process at YDC, and Quintanar became emotional when talking about his sisters. He asked when he would be taken to jail, and Investigator Huggins said whenever he was ready. Quintanar confirmed that he did not "have anything else to say." Investigator Huggins got up to leave, about four hours after the interview had begun. As she grabbed the door handle, Quintanar stopped her and said he was there when the shooting happened, "it wasn't supposed to go down like that but it did," and "there, y'all got me, I don't give a f**k no more." When Investigator Huggins asked who came up with the idea, Quintanar said it was Resendiz-Garcia. Quintanar then explained that, after Gilead and Wiles exited the vehicle, Quintanar struggled with Gilead over his firearm, regained control of it, and shot Gilead. At the hearing on Quintanar's motion to suppress those statements, both officers who interviewed

16

Quintanar gave testimony consistent with the video recording and also testified that neither of them threatened him, coerced him, or promised him anything for his cooperation.

Contrary to Quintanar's specific arguments set forth above, the trial court did not err by concluding that his statement was voluntary. The officers did not talk to him without his mother present until he agreed to speak with them after asking about what would happen if she did not come. See *Lester v. State*, 310 Ga. 81, 88 (2) (849 SE2d 425) (2020) (The absence of a parent, especially when the juvenile has acquiesced in nevertheless being interviewed, is "merely one factor a trial court should consider in its totality-of-the-circumstances evaluation of the voluntariness of a juvenile's statement."), disapproved on other grounds in *Clark*, 315 Ga. at 435 (3) (b) n.16. And there is no evidence of the "hallmarks of coercive police activity," i.e., "excessively lengthy interrogation, physical deprivation, [or] brutality." See *Drake*, 296 Ga. at 291 (3) (citation and punctuation omitted). To the extent that Detective Hennelly's statement about Quintanar going to prison for the rest of his life

17

"because you want to say you were not there" was artifice or deception, it was not "calculated to procure an untrue statement." See id. at 290 (3). Moreover, although the officers lied about the evidence against Quintanar, they "did nothing to suggest that a confession would not be used against [him]." *Matthews*, 311 Ga. at 541 (3) (a). Absent evidence of coercive police conduct, and considering all of the circumstances here, including the officers' testimony and our de novo review of the entire video recording, we conclude that the trial court did not err in determining that Quintanar's statement was voluntary as a matter of constitutional due process. See *Griffin v. State*, 309 Ga. 860, 869 (4) (849 SE2d 191) (2020) ("Considering the totality of the circumstances surrounding [the appellant's] custodial statement, including the detectives' testimony concerning [his] demeanor, conduct, and responses to their questions during the interview, as well as our de novo review of the video recording of the interview, we conclude that the trial court did not err in finding that [the appellant's] statement was voluntarily made.").

2. Quintanar contends that the trial court violated the best-evidence rule[3] when it admitted Officer Bucknor's testimony about a body-camera video recording of his attempted traffic stop of Quintanar's vehicle even though the recording was not introduced into evidence. Because it is highly probable that the alleged violation of the best-evidence rule did not contribute to the verdict, there is no reversible error.

An erroneous evidentiary ruling, without more, does not require reversal if it was harmless. See OCGA § 24-1-103 (a) ("Error shall not be predicated upon a ruling which admits or excludes evidence unless a substantial right of the party is affected[.]"). "In determining whether the error was harmless, we review the record de novo and weigh the evidence as we would expect reasonable jurors to have done so. The test for determining nonconstitutional

---

[3] The best-evidence rule provides that, "[t]o prove the contents of a writing, recording, or photograph, the original writing, recording, or photograph shall be required." OCGA § 24-10-1002. Thus, proving the contents of a video recording "generally requires a party to admit the original recording." *Render v. State*, 320 Ga. 890, 899 (3) (912 SE2d 679) (2025). However, the original will not be required in certain specified circumstances. See OCGA §§ 24-10-1004, 24-10-1007.

harmless error is whether it is highly probable that the error did not contribute to the verdict." *Clarke v. State*, 308 Ga. 630, 634 (2) (842 SE2d 863) (2020) (citation and punctuation omitted).

In this case, Officer Bucknor testified on direct examination that he received information that Quintanar was in a certain vehicle in a particular location and was a "skinny male with almost bright orange hair, light auburn-type color hair, short." Bucknor subsequently stopped the described vehicle after dark in a well-lit parking lot. Four people were in the vehicle, and Bucknor identified Quintanar as the person who exited the rear passenger-side door and ran away. A loaded firearm was found under the front passenger seat, accessible from the rear seat on that side. Quintanar was wearing a hoodie, and Bucknor did not see his face, but the hoodie came off, and Bucknor identified Quintanar based on observation of his "clearly dyed" orange hair. During cross-examination, Officer Bucknor testified that there was video from a body-worn camera that showed what happened. When defense counsel asked to see it, the prosecutor said, "we hadn't planned to play it, but we can." After

20

admitting the firearm and bullets over defense counsel's objection, the trial court ruled that either party could play the body-camera video, and defense counsel said, "It's their prerogative. I'd be delighted to see it if they wish to show it to us."

During redirect examination, Bucknor testified he watched the body-camera video in preparation for court, the prosecutor asked if he was "able to see Mr. Quintanar's orange hair in the body camera," and Bucknor responded affirmatively. Quintanar objected that the "body camera will speak for itself." The prosecutor responded that she was "asking about his foundation for his testimony in terms of being able to recognize" Quintanar's picture on another exhibit. The trial court overruled the objection, and the prosecutor said it would take 10 or 15 minutes to pull up the body-camera video. Neither the State nor Quintanar ever introduced the video despite its availability.[4]

---

[4] The District Attorney claims that Quintanar waived this issue because he never attempted to play the video recording and instead suggested that the prosecution play it and argued to the jury that neither the recording nor the testimony of any of the other three persons in the vehicle was ever presented.

Assuming without deciding that the trial court abused its discretion when it admitted Officer Bucknor's testimony on redirect examination over Quintanar's objection, the error was harmless. Bucknor's testimony on redirect examination about what he saw on the video recording was cumulative of his prior eyewitness identification testimony based on his personal observation of the traffic stop, to which Quintanar did not object. The evidence against Quintanar, including his confession, was strong. And the challenged testimony was relevant only to show that Quintanar fled from a traffic stop just three days after the murder. Moreover, Quintanar was able to argue to the jury that the identification of him at the traffic stop was unreliable because neither the recording nor the testimony of any of the other three persons in the vehicle was ever presented. Under these circumstances, we conclude that it is highly probable that any error in the admission of Officer Bucknor's testimony about what he saw on the video recording did not

However, we need not definitively decide whether Quintanar waived this issue. Instead, we assume, only for purposes of this appeal, that Quintanar did not waive this issue but preserved it for ordinary review.

22

contribute to the verdict. See *Madera v. State*, 318 Ga. 593, 596 (2) (899 SE2d 132) (2024) ("It is well settled . . . that the erroneous admission of evidence that is merely cumulative of other properly admitted evidence is generally harmless, particularly where the evidence of the defendant's guilt is strong."). Cf. *Render v. State*, 320 Ga. 890, 901 (4) (912 SE2d 679) (2025) (assuming without deciding on plain-error review that certain accomplice testimony was a clear and obvious error under the best-evidence rule, and concluding that the appellant did not show prejudice because the challenged testimony was relevant only to show that he had been with an accomplice inside the vehicle used in the crime on the day after the shooting and the testimony was cumulative of the accomplice's separate testimony from personal experience.).

3. Quintanar contends that the trial court wrongfully prevented him from fully cross-examining Resendiz-Garcia about the reduced sentence Resendiz-Garcia received in exchange for his testimony. Quintanar asserts that this ruling violated his right to confront witnesses against him under the federal and state

constitutions and his right to a thorough and sifting cross-examination. We see no reversible error.

Criminal defendants are entitled to confront witnesses against them and to a thorough and sifting cross-examination. See U.S. Const. Amend. VI ("In all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him[.]"); Ga. Const. of 1983, Art. I, Sec. I, Par. XIV ("Every person charged with an offense against the laws of this state . . . shall be confronted with the witnesses testifying against such person."); OCGA § 24-6-611 (b) ("The right of a thorough and sifting cross-examination shall belong to every party as to the witnesses called against the party."). That can include the right to ask a testifying co-defendant about any benefit he received in exchange for his testimony, including a change in when the witness could become eligible for parole. See *Jones v. State*, 305 Ga. 750, 754 (2) (d) (827 SE2d 879) (2019); *Manley v. State*, 287 Ga. 338, 341-343 (2) (698 SE2d 301) (2010). But the right to cross-examination is not unlimited, and the trial court has discretion to limit it. See *Manley*,

287 Ga. at 340 (2).

In this case, Resendiz-Garcia testified that he was originally charged with murder, which he knew carried a life sentence, but that he later pleaded guilty to a reduced charge of manslaughter in return for his testimony and was sentenced to 40 years, with 20 years to be served in prison. He also conceded that he would not have received the plea deal if he had admitted that he was the shooter. On cross-examination, defense counsel tried to establish whether Resendiz-Garcia knew that, had he received a life sentence, he would have to serve 30 years before being eligible for parole. The State objected, and the trial court sustained the objection.

Quintanar now argues that his cross-examination was unfairly limited because he was not allowed to fully explore exactly what Resendiz-Garcia understood about the different possibilities for parole under his original charges versus under his plea deal. But even assuming that the trial court abused its discretion by limiting cross-examination in that way, the error was harmless beyond a reasonable doubt. See *Jones v. State*, 314 Ga. 605, 616 (4) (878 SE2d

505) (2022) ("A constitutional error is harmless when the State proves beyond a reasonable doubt that the error did not contribute to the verdict, such as when the evidence at issue is cumulative of other properly-admitted evidence or when the evidence against the defendant is overwhelming." (citation and punctuation omitted)).

The jury heard about Resendiz-Garcia's original charges and his reduced charges. The jury heard that he got the plea deal in exchange for his testimony. The possibility that the jury would have reached a different verdict if it heard a little more about exactly what Resendiz-Garcia understood about the details of the parole system is small. That is especially so given the strong evidence of Quintanar's guilt. For these reasons, any error was harmless beyond a reasonable doubt. See *Jones*, 305 Ga. at 754 (2) (d) (holding that any error in limiting the appellant's cross-examination on the issue of parole eligibility was harmless, in light of the strength of the evidence against him and substantial testimony from his accomplice "concerning the favorable plea deal resulting in a major reduction in the sentences [she] faced, thereby establishing [her] potential bias

26

toward the State"); *Manley*, 287 Ga. at 343 (2) (holding that trial court erred in excluding evidence of changes in eligibility of a State's witness for parole resulting from her plea and sentencing deal, but that the error was harmless because the appellants "were allowed to extensively cross-examine [the witness] about her potential bias flowing from her plea deal with the State which reduced her possible sentence of life imprisonment to only a six-year sentence").

4. Quintanar contends that the trial court erred by failing to give his requests to charge the jury on the exercise of self-defense while in the commission of a felony and on mutual combat. Although Quintanar did request both charges and made timely objections to their omission, the evidence in this case did not authorize either of his requested jury instructions.

(a) Quintanar's argument regarding his request for a self-defense instruction is difficult to follow. The jury was charged on the lesser offense of voluntary manslaughter, but, as Quintanar conceded, the evidence did not warrant a jury instruction addressing whether he acted in self-defense. Instead, the undisputed evidence

27

showed that Quintanar was one of the initial aggressors and was committing a felony against Gilead. See OCGA § 16-3-21 (b) ("A person is not justified in using force . . . if he . . . [i]nitially provokes the use of force against himself with the intent to use such force as an excuse to inflict bodily harm upon the assailant;" if he "[i]s attempting to commit [or] committing . . . a felony; or" if he "[w]as the aggressor or was engaged in a combat by agreement unless he withdraws from the encounter and effectively communicates to such other person his intent to do so and the other, notwithstanding, continues or threatens to continue the use of unlawful force."). *Kinlaw v. State*, 317 Ga. 414, 423 (5) (893 SE2d 712) (2023) ("Indeed, it would turn the law on its head to allow an armed aggressor, who confronts an unarmed nonthreatening victim, to claim self-defense when the victim is shot during the victim's struggle to disarm the aggressor." (citation and punctuation omitted)).

Quintanar argues, however, that – because Gilead was committing the drug-related felonies of possession with intent to distribute marijuana and possession of more than one ounce of

marijuana and therefore, under OCGA § 16-3-21 (b) (2), would not have been entitled to self-defense if he had killed one of the robbers – the jury should have been charged that "a person is not justified in using force if that person is attempting to commit, committing, or fleeing after the commission or attempted commission of a felony," especially when the prosecutor argued in closing that Gilead was "defending himself" and was entitled to use "deadly force." Quintanar also argues that the omission of his requested self-defense charge prevented the jury from finding the provocation required to find him guilty of voluntary manslaughter.

Whether Gilead acted in self-defense is not relevant to Quintanar's culpability. Consistent with *Kinlaw*, and as Quintanar concedes, he could not claim self-defense, regardless of whether Gilead acted in self-defense. Similarly, Quintanar has not shown how his level of culpability in any way depends on Gilead's hypothetical non-entitlement to self-defense. The jury was fully and fairly instructed on voluntary manslaughter. Quintanar has failed to explain how his request for an isolated instruction – on one aspect

29

of the *victim's* non-entitlement to self-defense – was relevant to whether Quintanar acted in response to a serious provocation. See OCGA § 16-5-2 (a) ("A person commits the offense of voluntary manslaughter when he causes the death of another human being under circumstances which would otherwise be murder and if he acts solely as the result of a sudden, violent, and irresistible passion resulting from serious provocation sufficient to excite such passion in a reasonable person[.]"); *Shaw v. State*, 301 Ga. 14, 20 (3) (799 SE2d 186) (2017) ("The provocation necessary to support a charge of voluntary manslaughter is markedly different from that which will support a self-defense claim." (citation and punctuation omitted)). Whether or not Gilead would have been legally entitled to claim self-defense if he were the defendant has no bearing on whether his actions to defend himself as the victim counted as a sudden and severe provocation that could reduce Quintanar's offense from murder to voluntary manslaughter. See OCGA § 16-5-2 (a). Nothing in the definition of voluntary manslaughter requires that the provocation be illegal or unjustified. Id.

Because there was not even slight evidence to support the theory of Quintanar's requested jury charge related to self-defense, the trial court did not err in rejecting that requested charge. See *Bowman v. State*, 317 Ga. 457, 461 (2) (a) (893 SE2d 735) (2023) (A jury "instruction is authorized as long as slight evidence supports the theory of the charge." (citation and punctuation omitted)); *Munn v. State*, 313 Ga. 716, 722 (3) (873 SE2d 166) (2022) ("To authorize a jury charge [on justification], there must be slight evidence supporting the charge.").

(b) As for the other request to charge, the evidence did not warrant a jury instruction on mutual combat. "Mutual combat occurs when there is combat between two persons as a result of a sudden quarrel or such circumstances as indicate a purpose, willingness, and intent on the part of both to engage mutually in a fight." *Jones v. State*, 319 Ga. 140, 147 (4) (902 SE2d 599) (2024) (citation and punctuation omitted). Fighting to repel an unprovoked attack "should not be confused with mutual combat." *Tidwell v. State*, 312 Ga. 459, 463 (1) (863 SE2d 127) (2021) (citation and

31

punctuation omitted). Quintanar argues that a mutual combat instruction was supported by the evidence that Gilead picked up a machete at first, tackled Quintanar, grabbed the gun, pistol-whipped Quintanar, and wrestled with him. However, such evidence of a violent struggle – involving Gilead's fighting to repel an unprovoked attack that began while he slept – did not constitute even slight evidence to support a jury charge on mutual combat, as that evidence did not show circumstances indicating an agreement, willingness, or readiness on the part of both to engage mutually in a fight. See *Jones*, 319 Ga. at 147 (4) (holding that trial court did not err in failing to instruct the jury on mutual conduct where there was evidence of a struggle but the appellant did not point to any evidence of combat between him and the victim resulting from circumstances indicating a "purpose, willingness, and intent on the part of both to engage mutually in a fight" (citation and punctuation omitted)); *Tidwell*, 312 at 463 (1) (holding that trial court did not err in failing to instruct the jury on mutual combat where "there [was] no evidence of an agreement, willingness, or readiness to fight between

[the victim] and any of his attackers" and the evidence instead showed that the victim "was ambushed" by the appellant and others "while he slept" and that the victim later charged at them and tried to hit them).

5. Quintanar contends that certain portions of the State's closing argument – telling the jury that the victim's force was justified[5] – amounted to plain error. But Quintanar made no objection at trial to those portions of the State's closing argument. And it is well-settled that "we do not review unpreserved challenges to closing arguments in non-death penalty cases, even for plain error." *Troutman v. State*, 320 Ga. 489, 494 (2) (b) (910 SE2d 173) (2024) (citation and punctuation omitted). This claim therefore presents nothing for review.

6. Quintanar finally contends that the cumulative effect of the alleged errors prejudiced him and warrants a new trial. To establish cumulative error, Quintanar "must establish that at least two errors

___

[5] Quintanar specifically complains of the prosecutor's statements that Gilead was "defending himself," "didn't do anything wrong that night," and was entitled to use "some kind of deadly force."

were committed in the course of the trial and considered together along with the entire record, the multiple errors so infected the jury's deliberation that they denied him a fundamentally fair trial." *Platt v. State*, 319 Ga. 1, 12 (4) (901 SE2d 114) (2024) (citation and punctuation omitted). Although we have assumed two errors by the trial court in the course of our analysis, we conclude that they do not warrant a new trial here.

In Divisions 2 and 3 above, we assumed, without deciding, that the trial court abused its discretion in admitting Officer Bucknor's testimony about what he saw on the video recording of his traffic stop and that the trial court also abused its discretion by precluding Quintanar from further cross-examination of Resendiz-Garcia about potential disparities in his parole eligibility with and without his plea deal. These assumed "errors addressed entirely different issues in the case," *Pender v. State*, 311 Ga. 98, 120 (6) (856 SE2d 302) (2021), and, as explained above, they each produced very little, if any, harm. The admission of Bucknor's testimony about the video recording was harmless for several reasons, including the fact that

it was cumulative of his own properly admitted prior testimony based on personal observation. And the limitation on cross-examination of Resendiz-Garcia about parole was harmless beyond a reasonable doubt for several reasons, including the admission of substantial testimony from him about favorable aspects of his plea deal.

Given the strength of the properly admitted evidence against Quintanar, we are persuaded beyond a reasonable doubt[6] that the cumulative prejudice of the assumed errors did not deny him a fair trial. See *Platt*, 319 Ga. at 12 (4) (holding that, because two assumed "errors produced very little, if any, harm[,] . . . given the strength of the evidence, even if these assumed errors could be considered cumulatively, the cumulative prejudice did not deny [the appellant] a fair trial"); *Lofton v. State*, 309 Ga. 349, 367 (7) (846 SE2d 57)

_____

[6] One assumed error in this case was partly constitutional in nature, and the other one was not. As was true at the time of *Pender*, "[w]e have yet to decide how multiple standards for assessing prejudice may interact under cumulative review of different types of errors, and again we need not do so here, because [the appellant]'s claims of cumulative prejudice fail under even the higher standard implicated by these errors, which requires the State to prove that violations of [the appellant]'s right to confront witnesses were harmless beyond a reasonable doubt." 311 Ga. at 120 (6) (citation omitted).

(2020) ("[E]ven when considered as a whole under the most demanding standard that applies to any of the alleged errors, the cumulative prejudicial effect of the actual and assumed evidentiary errors and counsel's deficiencies is not sufficient to outweigh the strength of the properly admitted evidence of the [a]ppellant's guilt . . . . Accordingly, we conclude that the combined prejudicial effect of the actual and assumed evidentiary errors and deficiencies by counsel did not deprive the [a]ppellant of his right to a fundamentally fair trial.").

7. Quintanar does not raise the issue on appeal, but we have identified a merger error in his sentencing. See *Dixon v. State*, 302 Ga. 691, 696-697 (4) (808 SE2d 696) (2017) ("We have the discretion to correct merger errors sua sponte . . . because a merger error results in an illegal and void judgment of conviction and sentence."). The count of aggravated assault with a deadly weapon against Wiles should have been merged into the attempted armed robbery conviction also involving Wiles. See *Reeves v. State*, 309 Ga. 645, 649 (4) (847 SE2d 551) (2020). See also *Rice v. State*, 311 Ga. 620, 625

36

(2) (857 SE2d 230) (2021). We therefore vacate Quintanar's conviction and sentence for aggravated assault.

*Judgment affirmed in part and vacated in part. Peterson, CJ, Warren, PJ, and Bethel, McMillian, LaGrua, Colvin, and Pinson, JJ, concur.*